## NEW, Postmaster General, v. TRIBOND SALES CORPORATION.

Court of Appeals of District of Columbia.
Submitted March 8, 1927. Decided
May 2, 1927.

Petition for Rehearing Denied May 20, 1927.

No. 4447.

1. **Post office** ⬥⟹26—Postmaster General's determination that hosiery sale scheme was fraudulent held not palpably wrong, and injunction against enforcement of fraud order unwarranted (Comp. St. §§ 7411, 7573).

Postmaster General's determination that scheme for sale of hosiery through contracts bearing coupons to be sold by purchaser, with right to coupon purchasers to similar contracts, was inherently a lottery and fraudulent, *held* not palpably wrong, and hence enforcement of fraud order, issued under Rev. St. §§ 3929, 4041 (Comp. St. §§ 7411, 7573), could not be enjoined.

2. **Constitutional law** ⬥⟹318—Postmaster General's exercise of statutory jurisdiction in issuing fraud order is "due process of law" (Comp. St. §§ 7411, 7573).

Postmaster General's exercise of jurisdiction conferred on him by Rev. St. §§ 3929, 4041 (Comp. St. §§ 7411, 7573), in issuing fraud order, is "due process of law."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Due Process of Law.]

Graham, Acting Associate Justice, dissenting.

Appeal from Supreme Court of District of Columbia.

Suit by the Tribond Sales Corporation against Harry S. New, Postmaster General of the United States. Decree for plaintiff, and defendant appeals. Reversed and remanded.

Peyton Gordon, L. A. Rover, and C. W. Hassell, all of Washington, D. C., for appellant.

E. F. Colladay, C. C. Cooper, Jr., and H. S. Barger, all of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, ROBB, Associate Justice, and GRAHAM, Presiding Judge of the United States Court of Customs Appeals.

ROBB, Associate Justice. Appeal from a decree in the Supreme Court of the District of Columbia, granting a permanent injunction against the enforcement of a fraud order theretofore issued by the Postmaster General against the Tribond Sales Corporation, the appellee.

[1] On April 6, 1925, the Solicitor for the Post Office Department filed written charges against the appellee, and gave notice that it show cause why a fraud order should not be issued against it. Hearings were had on these charges, resulting, on June 2, 1925, in a comprehensive written report by the Solicitor to the Postmaster General, concluding as follows: "I find that this scheme is a lottery, and is likewise inherently fraudulent. I therefore recommend that a fraud order be issued against the Tribond Sales Corporation at New York, New York."

On the day this report was made the Postmaster General, "upon evidence satisfactory to him" (sections 3929 and 4041, R. S. [Comp. St. §§ 7411, 7573]), issued the fraud order in question. On June 3, 1925, appellee obtained from the court below a temporary injunction against the enforcement of the fraud order, and on June 12th an injunction pendente lite was issued. Thereupon a hearing was had in the court below, resulting, on June 14th, in the permanent injunction from which this appeal was taken.

Appellee's scheme contemplates the sale of so-called "contracts," to each of which is attached three coupons, designated respectively as coupon A, coupon B, and coupon C. The "contract" reads as follows:

"No. ———.

"Tribond Sales Corporation, 150 Broadway, New York City.

"The Tribond Sales Corporation, hereinafter known as the corporation, acknowledges receipt of the sum of four ($4) dollars from ———, hereinafter known as the receipt holder, on account of the purchase of one lot of hosiery, to be chosen from those described on the reverse side hereof, of the agreed price and reasonable value of ten ($10) dollars, the corporation to make immediate delivery upon the payment of the balance of six ($6) dollars on the purchase price within the period of one (1) year from the date hereof.

"The corporation, being desirous of extending its business through its customers, makes the following offer, of which the receipt holder may, if he so desires, avail himself prior to payment of the balance of the purchase price:

"The receipt holder may sell under contract three (3) lots of hosiery to three (3) purchasers, under similar terms and conditions as herein stipulated, in the following manner:

"He shall issue the three (3) coupons attached hereto for the sum of one (1) dollar per coupon to any one desiring to purchase a lot of hosiery of similar description, and shall retain the money so received as his own with the consent of the respective purchasers, forwarding to the corporation, for its records, the names and addresses of such coupon holders on the enclosed sheet.

"The holder of the coupon shall immediately remit the same to the office of the corporation, together with the sum of three ($3) dollars, and will receive in return therefor a receipt and contract acknowledging four ($4) dollar payment on account of said hosiery and similar in all respects to the one herein issued.

"As soon as all three (3) of these coupon remittances are received by the corporation, there will be forwarded to the receipt holder the lot of hosiery selected without any further payment on his part.

"The same offer applies to all persons contracting for the purchase of said hosiery; that is, either to remit the sum of six ($6) dollars balance, or assist in the sales of the corporation in the manner herein above described.

"In the event that the receipt holder shall sell only two lots of hosiery, said receipt holder shall remit to the corporation the sum of three ($3) dollars, accompanied by this contract and the unsold coupon, and he shall immediately receive delivery of the lot of hosiery selected.

"In the event that the receipt holder shall sell only one lot of hosiery, said receipt holder shall remit to the corporation the sum of five ($5) dollars, accompanied by this contract and the two unsold coupons, and he shall immediately receive delivery of the lot of hosiery selected.

"It is distinctly understood that, for the purposes of this contract, a sale shall not be deemed consummated by the receipt holder until the sum of three ($3) dollars has been remitted to the Tribond Sales Corporation by each coupon purchaser.

"It is understood and agreed that the system of the Tribond Sales Corporation is by no means imposed upon prospective purchasers. On the contrary, it represents a proposition to them whereby they may obtain ten dollars' worth of hosiery at a considerable re-

duction in proportion with the results obtained by them in assisting and promoting the sales of the Tribond Sales Corporation.

"The receipt holder undertakes to communicate to his coupon purchasers the exact terms of this contract, so as to avoid any misunderstandings and insure proper execution of the terms and conditions in the contract, and for that purpose receives herewith three (3) true copies of said contract.

"Tribond Sales Corporation,

"By ———, Secretary-Treasurer.

"Date: ———.

"Please mention the number of your contract or coupon in all correspondence."

On the face of each coupon is the following:

"Tribond Sales Corporation, 1225 Broadway, New York.

"Coupon ———.    $1.00.    No. ———.

"Holder:    ———.    (Print name in full.)

"———.    (Street and number.)

"———.    (City and state.)

"Important:   Read other side."

The reverse side of each coupon bears the following:

"The sum of one ($1) dollar paid for this coupon is part payment on account of the purchase price of one lot of hosiery to be chosen from those described on the reverse side of the contract to which this coupon was attached, and of which contract the holder of this coupon acknowledges having received a true copy; said holder declares having carefully noted the terms of sale stipulated in said contract and hereby accepts and agrees to fully comply with same in their entirety.

"The holder of this coupon undertakes and agrees to immediately send to the Tribond Sales Corporation the sum of three ($3) dollars, together with this coupon, and will receive in return therefor an original receipt and contract acknowledging four ($4) dollar payment on account of the purchase price of the lot of hosiery mentioned, which contract is similar in all respects to the one to which this coupon was attached."

A blank form is sent to each "contract" purchaser, upon which to report to the corporation the names and addresses of the purchasers of the three coupons, each of whom receives his "contract" on the same conditions as the original purchaser.

The cost of this "contract" to the purchaser is $4. Upon consummation of the purchase he is designated as "the receipt holder." He may sell the three coupons for $1 each, and, "with the consent of the respective purchasers," retain the $3. The "receipt holder" then

19 F.(2d)—43

has $1 invested in the scheme. If and when each of the three "respective purchasers" remits to the appellee $3, the "receipt holder" is entitled to his hosiery without further payment. This hosiery costs appellee $5.50 and is of the reasonable value of $10. It is apparent, therefore, that if the "receipt holder" succeeds in selling the three coupons, and each of the purchasers remits $3 for another "contract" containing three more coupons, the original "receipt holder" receives goods of the value of $10 for an expenditure of $1. In other words, he gets ten for one. If the original "receipt holder" succeeds in selling only two coupons, and each of the purchasers makes return as in the first instance, the "receipt holder" may obtain the hosiery, of the value of $10, by remitting to the corporation $3 and returning the unsold coupon. The "receipt holder," having reduced his original investment of $4 by the sale of the two coupons for $2, thus gets the hosiery for a total investment of $5. He therefore obtains for $5 hosiery of the value of $10, or gets two for one. If the "receipt holder" succeeds in selling but one coupon, he may obtain the hosiery by returning the two unsold coupons and paying $5, so that in this instance he obtains goods of the value of $10 for a total investment of $8, or gets five for four. If he succeeds in selling no coupons, he is entitled to the hosiery upon returning the three unsold coupons and paying $6. In this instance his investment is $10 and the goods received are of that value.

It therefore is apparent that the "receipt holder," under varying conditions, may get ten for one, two for one, five for four, or ten for ten, and that the system works in mathematical progression; each coupon issued requiring three additional coupons to complete the first. In other words, the scheme contemplates that each of the three immediate successors in the chain will substantially pay for the hose furnished their predecessor, through the remittance by each of $3 to the appellee. It may be observed here that the appellee always has at least $10 in hand before sending the goods.

The record indicates that appellee started with 36 "contract" holders who elected to sell coupons. The tenth progression of a chain, commencing with these 36, might result in there being outstanding 2,125,764 coupons. The fifteenth progression of the chain, if unbroken, might reach a total of 516,560,652 outstanding coupons. While it is unlikely that the chain would progress to such an extent in any locality, it is apparent that the extent to which a chain has progressed in a

given locality will have material bearing upon the ability of "contract" holders to dispose of coupons, through the narrowing of the field of possible purchasers. It is practically impossible for a "contract" holder to obtain any advance information in this connection, but the appellee is much more advantageously situated in this respect.

It is apparent, we think, from what we have said, that whether a "contract" holder will get his hosiery for an investment of $1, $5, $8, or $10, depends upon contingencies largely beyond his control. First, there is the requirement that the three "respective purchasers" to whom he sells the three coupons will in turn remit $3 each to the corporation for three other "contracts." These coupon purchasers may, upon inquiry, ascertain that others are trying to sell coupons, and they may, for this or some other reason satisfactory to them, conclude to forfeit the $1 paid for the coupon and abandon the scheme. Obviously this is a matter beyond the control of the original "receipt holder," and, as to him, a matter of chance. Another circumstance is that those who embark upon the scheme at its inception have a better chance to earn a prize than those who take it up later. Although this element of chance is not as pronounced as that in the first instance, it may be present.

It is contended that the "contract" is plain and unambiguous, but in our view it is very adroitly worded, intended to appeal, and actually appealing, to the credulity and cupidity of those likely to embark upon such a scheme. There is one feature of the so-called contract that will be understood by all who are led into it, and that is the possibility of ten for one. Most of those who can afford to purchase silk hosiery will buy in the regular or usual way. What makes this scheme attractive and possible is the ten for one feature. That is the lure employed. As was observed by the Supreme Court of North Caroline in State v. Lipkin, 169 N. C. 265, 84 S. E. 340, L. R. A. 1915F, 1018, Ann. Cas. 1917D, 137, "no sooner is a lottery defined, and the definition applied to a given state of facts, than ingenuity is at work to evolve some scheme of evasion which is within the mischief, but not quite within the letter, of the definition. * * * The court will inquire, not into the name, but into the game, however skillfully disguised, in order to ascertain if it is prohibited, or if it has the element of chance. It is the one playing at the game who is influenced by the hope, enticingly held out, which is often false or disappointing, that he will, per-

haps and by good luck, get something for nothing, or a great deal for a very little outlay. This is the lure that draws the credulous and unsuspecting into the deceptive scheme, and it is what the law denounces as wrong and demoralizing."

As already observed, appellee always has $10 or more in hand before it parts with the hosiery. It is manifest that, when the point of saturation is reached, and in many instances before that time, there will be many coupon holders who will prefer or be compelled to abandon the scheme and forfeit what they have paid. And there are bound to be other instances where, after investing $4 in a "contract," the contract holder will be unable to sell any of his coupons, and prefer or be compelled to forfeit the $4 he has paid, thereby enriching the corporation to that extent.

[2] Sections 3929 and 4041, R. S., impose upon the Postmaster General the duty and responsibility of determining whether the mails are being used by any person or company in conducting any lottery, gift enterprise, or scheme for the distribution of money or of any real or personal property by lot or chance, or in conducting any scheme for obtaining any money or property of any kind by means of false or fraudulent pretenses, representations, or promises. If the evidence is "satisfactory to him," a fraud order is issued. The obvious purpose of the statute is to purge the mails of objectionable matter. The exercise of this jurisdiction by the Postmaster General is due process of law, and his decision will not be disturbed, unless he "has exceeded his authority or his action is palpably wrong." Public Clearing House v. Coyne, 194 U. S. 497, 509, 24 S. Ct. 789, 794 (48 L. Ed. 1092); Bates & Guild Co. v. Payne, 194 U. S. 106, 24 S. Ct. 595, 48 L. Ed. 894.

The fraud order in the present case recites that it has been made to appear to the Postmaster General, "upon evidence satisfactory to him, that the Tribond Sales Corporation, and its officers and agents as such at New York, N. Y., are engaged in conducting a scheme or device for obtaining money through the mails by means of false and fraudulent pretenses, representations, and promises, and for the distribution of prizes by lot or chance, in violation of" law. We are asked to hold that this action of the Postmaster General is so "palpably wrong" as to amount to an abuse of discretion; in other words, that it has so little basis as to constitute a mere arbitrary exercise of power. What we already have said concerning the nature and effect of this scheme, with its element of chance and insid-

ious appeal, compels a rejection of this contention. A scheme almost identical with this was before the court in Hubbard v. Freiberger, 133 Mich. 139, 94 N. W. 727. The so-called contract in that case read as follows:

"How to Obtain a $60 Buggy for $3.75.

"Return this coupon to Oscar Auton, Gagetown, Tuscola county, Michigan, dealer in buggies, wagons, and agricultural implements of all kinds, with $15, for which he will deliver to you a book of four of these coupons. Sell these coupons for $3.75 each, thereby getting your $15 back. Each of those to whom you sell a coupon sends to me, purchasing a book for themselves. When your four coupons have been sent in to me this way, you readily see I have received $60, and you will be entitled to $60 worth of merchandise at my store, and it costs you but $3.75 and a few hours' work selling the coupons.

"The right to redeem all coupons at any time is hereby reserved; and, in case Oscar Auton shall elect to redeem outstanding coupons, parties holding same shall be allowed the full value on the purchase price of any article in my establishment.

"Parties purchasing coupons and being unable to dispose of them will also be allowed face value, less amount paid for first coupon, on the purchase price of anything in my establishment. Coupons will not be redeemable in any other manner than as above specified."

After stating that the question was whether the undertaking was against public policy, the court said: "We are constrained to hold that it is. It is somewhat similar to the Bohemian Oats scheme, the workings of which are described in McNamara v. Gargett, 68 Mich. 454, 36 N. W. 218, 13 Am. St. Rep. 355. It is a scheme which, upon its face, shows that it cannot be worked out without ultimately leaving parties with these so-called coupons on their hands, possessing no value, and is well calculated to deceive ignorant people." In the McNamara Case, 68 Mich. 454, 36 N. W. 218, 13 Am. St. Rep. 355, the court ruled that the contract there involved was "essentially a gambling contract." See, also, Twentieth Century Co. v. Quilling, 130 Wis. 318, 110 N. W. 174; Corporate Organization & Audit Co. v. Hodges, 47 App. D. C. 460, L. R. A. 1918E, 491.

Rast v. Van Deman & Lewis Co., 240 U. S. 342, 365, 36 S. Ct. 370, 60 L. Ed. 679, L. R. A. 1917A, 421, Ann. Cas. 1917B, 455, involved the enforcement of a statute of Florida imposing special license taxes on merchants using profit-sharing coupons and trading stamps. While the question there differed from that here, an observation of the court in the course of the opinion is pertinent. After stating that direct advertising has no ulterior purpose, its object being merely to draw attention to the article to be sold, the court said: "The schemes of complainants have no such directness and effect. They rely upon something else than the article sold. They tempt by a promise of a value greater than that article and apparently not represented in its price, and it hence may be thought that thus by an appeal to cupidity lure to improvidence. This may not be called in an exact sense a 'lottery,' may not be called 'gaming'; it may, however, be considered as having the seduction and evil of such, and whether it has may be a matter of inquiry, a matter of inquiry and of judgment that it is finally within the power of the Legislature to make."

It results that the decree is reversed, with costs, and the cause remanded.

Reversed and remanded.

GRAHAM, Acting Associate Justice, dissents.