**UNITED STATES v. DONAHUE.**

No. 9616.

Circuit Court of Appeals, Eighth Circuit.
July 24, 1933.

Joseph W. Finley, Asst. U. S. Atty., of St. Paul, Minn. (Lewis L. Drill, U. S. Atty., of St. Paul, Minn., on the brief), for the United States.

John J. Keefe, of St. Paul, Minn. (Keefe & Fallon, of St. Paul, Minn., on the brief), for appellee.

Before KENYON, and VAN VALKENBURGH, Circuit Judges, and DEWEY, District Judge.

VAN VALKENBURGH, Circuit Judge.

This is a suit to recover upon a policy of war risk insurance. This policy expired by reason of nonpayment of premiums August 30, 1919. Suit was brought on the alleged ground that appellee was permanently and totally disabled on or before that date. The suit was filed in May, 1929, and this trial took place in November, 1931. At the close of all the evidence, counsel for the government moved for an order for a directed verdict in its behalf upon the ground that there was no substantial evidence to support a verdict for appellee-plaintiff below. This motion was overruled, and the jury returned a verdict for plaintiff, upon which judgment subsequently was entered. This appeal is based upon this action of the court in overruling the government's motion for a directed verdict.

The record discloses that plaintiff was injured June 23, 1918. He was riding on the top of the cab of a Packard truck while returning from leave to his station at Fromentine, France. As the truck struck an obstruction in the road, he was thrown off the cab, striking his left side on the radiator cap. Immediately thereafter he coughed, spat blood, and was treated by army and navy doctors. He stayed at his station, part of the time in a delirious condition, for six or eight days, and was then taken to a base hospital at Nantes, where he remained until October, 1918. Thereafter he was in base and navy hospitals in France and America until his discharge early in February, 1919.

As has been stated, his policy was kept in force until August 30, 1919. When injured, he weighed about one hundred and forty-five pounds. The first examination after his discharge was made by Dr. Haessly at plaintiff's home at Faribault, Minn., shortly before February 20, 1919. The physician states that he was advised that plaintiff began

coughing and expectorating almost immediately after the accident. At the time of the examination, however, he complained of no night sweats, had good appetite, and very little discomfort in his side, had no kidney trouble, and slept all night. The doctor made a diagnosis of empyema of the left pleural cavity with collapse of the left lung. He put plaintiff on a general tonic treatment; he says: "I gave just the general advice we would naturally give in these cases, of being careful of himself, not to catch cold, eat plenty of wholesome food, and get plenty of rest, and we gave a general tonic medication." By empyema, he explains, is meant pus in the pleural cavity, due to inflammation caused by a germ. Such an inflammation differs from that found in simple pleurisy. To relieve this, on May 10, 1919, a rib was resected on the left side and a drainage tube inserted. This seemed to effect relief—the empyema was either cured by the drainage or, at least, substantially arrested. He says he continued, however, to have some pain in this side, coughing, and shortness of breath.

In April, 1922, he underwent an operation for ruptured appendix and peritonitis. A tube was again placed in his left side, and drainage continued after this operation for a period of fifteen months. There is some question from the medical testimony whether this recurrence of pus in the pleural cavity was due to the ruptured appendix and resulting peritonitis, or whether the lowered resistance from this operation gave the portion affected by the old infection "a chance to light up" and make itself active. The continuance of this condition caused him in July, 1923, to enter hospital at Rochester, Minn., where, between August and November 20, 1923, a thoracoplasty operation was performed by a surgeon of the Mayo Clinic. A number of ribs on the left side were removed, leaving an opening below the armpit four and one-half inches wide, six and one-half inches long, and three or four inches deep. This wound at the time of trial still required dressings of cotton batting and sterilized gauze. Plaintiff was discharged from the hospital in July, 1924, and returned thereafter at intervals for treatment for a considerable period. The result of this last operation was to leave the heart protected only by a thin membrane instead of the wall of bone and tissue which was removed. This membrane receives some further support by continuous padding of the cavity on the left side. There is testimony that some sort of a leather or steel harness would be a protection against severe injury to the heart.

The several periods of employment of appellee after his discharge are thus set forth in the brief of counsel for appellant:

| | | |
|---|---|---|
| 1. Waybill clerk, Faribault, Minnesota, March, 1919, 2 weeks @ $60.00 to $75.00 per month....... | $ 30.00 | (23) |
| 2. Express messenger, Faribault to Wabasha, August to October 31, 1919 @ $107.00 per month...... | 321.00 | (23) |
| 3. Waybill clerk, Faribault, Minnesota, November and December, 1919, @ $60.00 or $70.00 per month ......................... | 120.00 | (23) |
| 4. Waybill clerk, Faribault, Minnesota, May, 1920, $60.00 or $70.00 per month.................... | 60.00 | (24) |
| 5. Relief cashier, Faribault, Minnesota, June to July, 1920....... | 115.00 | (24) |
| 6. Relief agent, Northfield, Minnesota, one month............... | 100.00 | (24) |

7. Clerical worker, Marshall, Minnesota, August 17, 1920, to December, 1927, except a three month absence during April, May, June and July, 1922; and one year's absence from July, 1923, to July, 1924 (26). He was paid for his services at Marshall these amounts, a part thereof being for overtime:

| | | |
|---|---|---|
| 1920, August 17th to December 31st ............................ | 657.02 | |
| 1921, January 1st to December 31st ............................ | 1,616.67 | |
| 1922, January 1st to April $372.35 July to December 31.... 599.90 | 972.25 | |
| 1923, January to July 8........... | 622.12 | |
| 1924, July 16th to December 31st | 651.65 | |
| 1925, January 1st to December 31st ............................ | 1,403.64 | |
| 1926, January 1st to December 31st ............................ | 1,379.61 | |
| 1927, January 1st to November 30th ............................ | 1,342.60 | $8,645.56 |
| Total earnings ...................... | | $9,391.56 |

By stipulation this is supplemented by the following table:

| | Overtime hours worked. | Overtime pay. | Regular pay. | Total paid |
|---|---|---|---|---|
| 1920 | 147 | $124.37 | $ 532.65 | $ 657.02 |
| 1921 | 347 | 267.28 | 1,349.39 | 1,616.67 |
| 1922 | 75 | 38.27 | 933.98 | 972.25 |
| 1923 | 51 | 16.74 | 605.38 | 622.12 |
| 1924 | 56 | 38.74 | 612.91 | 651.65 |
| 1925 | 64 | 47.49 | 1,356.15 | 1,403.64 |
| 1926 | 58 | 49.43 | 1,330.18 | 1,379.61 |
| 1927 | 55 | 48.67 | 1,293.93 | 1,342.60 |
| Totals | 853 | $630.99 | $8,014.57 | $8,645.56 |

During this latter period of employment as clerical worker for the American Railway Express Company, from August 17, 1920, to December 1, 1927, he earned $8,645.56. Of this amount he estimates he paid out to others for help in handling very heavy packages, and during absences, in the neighborhood of $25 per month, and claims a total of such payments in the sum of $2,411.25, leaving a balance received by him of $6,234.31. He was absent during that period three months in 1922, and one year, from July, 1922, to July, 1923, because of the operations to which ref-

erence has been made. Nevertheless, his employment with the express company was substantially continuous. He was never removed as an employee, but continued in service on the same terms upon his return from medical or surgical treatment; and it appears that, during the last three years of this period, his service at full pay was practically uninterrupted. He was not discharged November 30, 1927, but quit of his own accord.

Appellee's duties as clerk for the express company were largely clerical. He says:

"My duties were the handling of all incoming and outgoing express, doing billing, collecting and regular office routine. I was to load and unload all the express. There was no other express employe there. I started to work at eight o'clock in the morning. The trains that passed through Marshall at that time were the short line that left for Sleepy Eye about 8:30 in the morning. All there was to do was bill the pasteboard boxes of bread and the express manager did that himself. The regular passenger was at 12:14 at noon. It left from Marshall and I was supposed to be there and turn over the express and load it on that train. It took about ten minutes, I imagine, to get rid of the short line train. After that until the 12 o'clock train I took all the waybills off incoming express that was to be delivered and the drayman loaded those packages into his dray. After he left I would fill in my express charges, write up the waybills and check the waybills of the day before. I was supposed to meet the 12:14 train, take off and load on my packages and express. The next train came through I think at 5:25 in the evening. I was supposed to meet that train and unload the express. There was no train other than these three that I had to take care of. So far as actual work—waybills and all that—I was not obliged to work over three hours per day. The rest of the time was my own and I took two hours for noon. I took two hours for noon in order to avoid overtime. Whenever there are less than five men working in an office they can make you work a split shift for eight hours. I was paid for working eight hours a day.

"When I went to Marshall I relieved the clerk there, took over his job and as far as handling the light packages I could do it but the heavy lifting I hired done. I went to the freight depot and made arrangements with them over there to do all the heavy work I couldn't do. I arranged it with the fellows —I called them over. Sometimes I paid them a dollar and sometimes not that much. They did all the heavy work, pushing around and loading into the cars. I drew no extra pay for doing this and paid them out of my own salary. At times Matt Starken would be there when I was away for a day or so and I would pay him. Sometimes I traded work. Sometimes he would have to check the yard for the railroad company and I would trade. I would check the yard and he would do my work. This checking was the taking of the amount of box cars and flat cars—listing the numbers. It was light work. He would do my work for me and I would do his for him. * * *

"The express received at Marshall would vary. Sometimes only a load of ladies goods or suits of clothes for the drygoods store packed in pasteboard boxes. These are not what somebody else handled, but crates of chickens, poultry, things like that, were too heavy. I could lift a case of clothes but a barrel of poultry that weighs two hundred or two hundred fifty pounds, I couldn't monkey with. It was my job to take care of this poultry and chickens and I was supposed to do it."

Undoubtedly many men, substantially in good health, would require help in handling the heavier packages mentioned.

Mr. D. M. King, agent at Marshall for the Chicago Northwestern Railroad Company and the American Railway Express Company, supervised appellee's work for the latter company. Concerning Donahue's duties Mr. King says:

"From the time Mr. Donahue first came to Marshall up until 1923 when he had this absence of a year Mr. Donahue did exactly this work in the course of his employment—he received and delivered all express matter that arrived at this station; he kept the records, made the deliveries, corrected the charges, made all the reports, and made remittances for the amount of money that he collected—general clerk as well as handling the packages. I wouldn't say definitely that Mr. Donahue while employed at Marshall handled any heavy packages or any heavy freight but he wasn't supposed to. I have no recollection of his having handled any heavy freight. His duties consisted of doing the clerical work and the handling of express packages. He wasn't intended to handle heavy packages. The heavier articles were handled by the express drayman that brought the express to and took it from the depot, who would handle the heavier packages and put them on a four wheel truck. That was the way business was usually carried on there at that time. The

drayman was paid for collecting and delivering express by the Express Company. In delivering and picking up of express he practically loaded and unloaded his own truck.

\* \* \*

"During the time he was there the work was of such a character that it was satisfactory to me. His work was well done in connection with his office work—that is, the making up of his reports and keeping his books up to date and the making of remittances and so on."

As to the manner of his payment appellee says: "The payroll was made up by myself. I arranged my own pay and the payroll records show that the pay was given to me. In other words, I paid myself. I paid these men out of my own salary."

After leaving the express company at Marshall, November 30, 1927, appellee says he tried selling groceries, etc., soliciting in both country and city. He found the sample case too heavy to carry. He also was employed as agent for the Singer Sewing Machine Company, but could not endure riding over rough roads in canvassing. He sought employment at different places, such as oil stations and grocery stores, but without success. This suit followed.

█ It is true that physicians testified that, from the progressive development of his injury, they consider that he was totally and permanently disabled prior to August 30, 1919. But such testimony cannot be indulged in the face of the physical facts, conceded even by appellee himself. It is urged that Donahue was enabled to keep his position with the express company through the favor of his employer. This contention is not supported by the record. It is true that the company was indulgent to his absences for medical treatment; but the work was kept up and his services were found to be satisfactory. He would not otherwise have been retained by a corporation of this nature for a period of seven years. At the time of the trial, his weight had increased to one hundred and eighty-five or one hundred and eighty-six pounds. There is no hint in the record that his work has aggravated his injury nor further impaired his health. Appellee undoubtedly has excellent qualifications for clerical work. The mere fact that these duties with the express company as an incident involved heavier work, which he may have paid others to perform for him, does not establish the claim that he was unable, for a substantial portion of the time, to pursue a gainful occupation. United States v. Perry (C. C. A.

8) 55 F.(2d) 819. Quite the contrary, in view of Mr. King's statement that his service was satisfactory, that he was not expected to handle heavy packages, and that it was known that other men in connection with the depot were doing portions of his work in so far as the heavy packages were concerned. It conclusively appears that he is able to discharge satisfactory clerical duties without injury inherent in those duties if such employment is obtainable. A person is not totally disabled because he is unable to perform a specific character of work. Injury to his heart, if that be feared, is no more imminent from light clerical work than from any other source of activity, even when unemployed. Nor is mere discomfort or inconvenience, suffered by many in civic life who are compelled to earn their living, sufficient to establish the required degree of disability. United States v. Harth (C. C. A. 8) 61 F.(2d) 541, 545.

█ Appellee kept his policy in force for a period of approximately six months after his discharge. According to his theory and that of his physicians, he was, during all that time, suffering from the effects of his injury of which he now complains. In addition to his earnings, he received substantial amounts from the government as compensation for partial disability. It cost him but $6.60 per month to keep his policy in force. Undoubtedly neither appellee nor his physicians at that time considered that he was totally disabled. We should not indulge the practice of permitting insurance to lapse, during periods of known affliction from service injuries, with the attempt, after years of gainful employment, to make a subsequent alleged condition relate back to a date when the war risk policy was still in force. The distinction between the insurance contract and compensation must be strictly drawn. This distinction has been announced so forcibly and repeatedly that further expansion and reiteration would be unprofitable. United States v. Perry (C. C. A. 8) 55 F.(2d) 819; United States v. McGill (C. C. A. 8) 56 F.(2d) 522; Nicolay v. United States (C. C. A. 10) 51 F.(2d) 170; United States v. Fly (C. C. A. 8) 58 F.(2d) 217; Eggen v. United States (C. C. A. 8) 58 F.(2d) 616; United States v. Harth (C. C. A. 8) 61 F.(2d) 541, 546.

In the latter case this language is found: "Appellee sustained a severe wound while in service on the field of battle. It is no doubt a serious handicap in the pursuit of a substantially gainful occupation. He is entitled to compensation commensurate with the disability he has suffered. If that he now receives

is inadequate, the law provides opportunity for review, and for increase, if that is found to be warranted. USCA title 38, § 494, p. 235; Hines v. United States ex rel. Livingston, 59 App. D. C. 363, 42 F.(2d) 347. But we cannot approve recovery upon a contract of insurance, the express and crucial terms of which have obviously not been met."

So, in the case before us, appellee has sustained a severe service injury. Our full sympathy, with that of the trial judge, goes out to him. He should receive substantial compensation commensurate with the disability he has suffered, and doubtless will upon review. But, for the reasons stated, he cannot recover in this action. The judgment below must be reversed and the case remanded for further proceedings in accordance with the views herein expressed.