## NATIONAL CONFERENCE ON LEGALIZING LOTTERIES, Inc., v. FARLEY, Postmaster General.

### No. 7031.

United States Court of Appeals for the District of Columbia.

Argued Feb. 8, 1938.

Decided March 28, 1938.

Horace J. Donnelly, Horace J. Donnelly, Jr., and John A. Nash, all of Washington, D. C., and Emil K. Ellis, of New York City, N. Y., for appellant.

Leslie C. Garnett, U. S. Atty., and Howard Boyd, Asst. U. S. Atty., both of Washington, D. C., for appellee.

Before GRONER, Chief Justice, and STEPHENS and EDGERTON, Associate Justices.

GRONER, C. J.

This is a bill in equity filed by National Conference On Legalizing Lotteries, Inc., against the Postmaster General, praying for an injunction to restrain him from seizing appellant's mail and returning it to the senders with the word "Fraudulent" written or stamped upon the outside thereof. The Postmaster General filed an answer, and the cause was heard by one of the judges of the United States District Court and the bill dismissed. This appeal followed.

The statute involved provides that, 39 U.S.C. § 259, 39 U.S.C.A. § 259: "The Postmaster General may, upon evidence satisfactory to him that any person or company is engaged in conducting any lottery, gift enterprise, or scheme for the distribution of money, or of any real or personal property by lot, chance, or drawing of any kind, * * * instruct postmasters at any post office at which * * * mail matter arrive * * * to return all such mail matter to the postmaster at the office at which it was originally mailed, with the word 'Fraudulent' plainly written or stamped upon the outside thereof."

Appellant is a corporation, said to be nonprofit, organized for the purpose of collecting and disseminating information on the subject of government-controlled lotteries with the view to the ultimate legalization of lotteries as a means of raising money for projects affected with a public interest. Several years ago, with that purpose in mind, appellant conducted a contest known as the "Slogan Sweepstakes"[1] the plan of which was to secure the best slogan to be used in conjunction with a picture drawn by Howard Chandler Christy. After the termination of that contest appellant began the one we have to consider here, and called it the "Selection Sweepstakes." The contest was conducted as follows:

Appellant published in newspapers and otherwise a large advertisement pointing out that: "France adopted a lottery to reduce its national debt; Italy to build railroads; Denmark to advance art and music; Holland to advance the sciences; Ireland to finance the building of hospitals; Spain for charitable institutions; Germany to finance public improvements, etc. England used to support its navy by public lotteries; early American colonies permitted lotteries to build schools, churches, and public works and improvements, such as canals, bridges, roads, etc. The Revolutionary War was in part financed with the proceeds of lotteries. Early buildings of Yale, Columbia and Harvard were built with the proceeds of lotteries."

Then the advertisement set forth in two columns, with a blank square opposite each item, 16 possible uses for money secured from lotteries, among which were: Money for hospitals, funds for social service charities, provision for unemployment relief, soldiers' bonus, reduction of state deficits, reduction of federal deficits, reduction of municipal deficits, provision for old age pensions, for public works, for religious institutions, etc. The advertisement then indicated the method of entering the contest. This was to read the paragraph telling how lottery money had been used in various public projects, etc., and then to number the 16 listed uses, or others which the contestant might prefer to substitute for any of them, in the order thought by the contestant to be the best

order of importance. That is to say, to place the number 1 in the square opposite the best use for lottery money, the number 2 opposite the second best, and so on, until each square was supplied with a number. The participant then wrote his name and address, inclosed $1 membership fee, and mailed his entry to appellant's office in New York City. The entry which, in the opinion of the judges, listed in the best order of importance the ways of using money raised by lotteries was entitled to the first prize of $20,000, the next to the second prize of $10,000, and so on down the list, including altogether 285 prizes, 250 of which were for $50 each.

The constitutionality of the statute pursuant to which the Postmaster General acted in this case was decided in Public Clearing House v. Coyne, 194 U.S. 497, 24 S.Ct. 789, 794, 48 L.Ed. 1092. There the Supreme Court said: "Inasmuch as the action of the Postmaster in seizing letters and returning them to the writers is subject to revision by the judicial department of the government in cases where the postmaster has exceeded his authority under the statute, (American School of Magnetic Healing v. McAnnulty, 187 U.S. 94, 23 S.Ct. 33 [47 L.Ed. 90]), we think it within the power of Congress to entrust him with the power of seizing and detaining letters upon evidence satisfactory to himself, and that his action will not be reviewed by the court in doubtful cases."

The solicitor of the Post Office Department before whom appellant had a preliminary hearing prior to the issuance of the fraud order, after a careful review of the facts, declared that the arrangement of the 16 uses in their best order of importance did not call for any skill or judgment since any reason for the arrangement offered by the contestant was not submitted to the judges, nor was or could be apparent to them—with the result, as he thought, that appellant's advertisement that "Your judgment is just as good as anyone else's" was correct. Consequently, he reported to the Postmaster General that appellant's scheme was designed for the sole purpose of appealing to the gambling instincts of persons who might be enticed to enter it. The Postmaster General thereupon determined that appellant was "en-

---

[1] This attracted subscribers who contributed approximately $200,000. The prizes awarded accounted for $20,000 of this. $13,000 was carried to surplus and the balance consumed in expenses.

gaged in conducting a scheme for the distribution of money * * * by lot or chance."

In view of what has been already said, it is apparent that the question here is whether there was any reasonable basis for believing that the present contest is a lottery or "scheme for the distribution of money * * * by * * * chance," for if there was, the action of the Postmaster General must stand. If not, there is no statutory basis for his order, and it must fall.

■ In Horner v. United States, 147 U. S. 449, at page 456, 13 S.Ct. 409, 37 L.Ed. 237, the opinion defines "lotteries" and gives a number of illustrations, from which it is declared that the term "lottery" embraces all schemes for the distribution of prizes by chance, such as policy-playing, gift-exhibitions, prize-concerts, raffles at fairs, and various other forms of gambling. So under the statute the test is whether success in any given contest depends upon skill or upon chance. If the award of the prize depends upon the exercise by the participants of judgment, the plan is not a lottery, for in that case the element of chance is lacking and winning depends upon the exercise of superior knowledge or skill. Illustrations frequently given in this class are chess, checkers, billiards, bowls, and quoits. Craps, keno, cock fighting, and raffles are frequently cited as pure games of chance. In Eastman v. Armstrong-Byrd Music Company, 8 Cir., 212 F. 662, 52 L.R.A.,N.S., 108, it was said—in the simplest definition that can be given—that a lottery is composed of three elements: Prize, consideration, and chance. The first two may exist in a game of skill; the last always converts the contest into a lottery or a gamble. The question then is whether the winning of the prizes under the instant scheme depends upon chance.

Looking at appellant's advertisements, we find there such statements as—"3 Minutes Time May Bring You $20,000—Easy To Do * * * Nothing To Write," and again—"Your judgment is just as good as anyone else's * * * you have just as great a chance to win as anyone," and—"Someone will get it for just a few strokes of a pen. Remember that there are 285 cash prizes * * * 285 chances for you to win."

The rules adopted by the promoters provided that the judges were to select and determine the particular one of the great number of answers which listed the uses in best order of importance, and the determination was to be made after the contest closed. But obviously no group of judges could be unanimous in their opinion of the best order of importance of such uses as—unemployment relief, old age pensions, social service charities, hospitals, medical research, reduction of taxes, and public works. Some are so related to others as to be inseparable, and it is perfectly obvious that the judges must, either in selecting the winner or in selecting a standard by which to judge the winner, adopt an arbitrary listing of the uses. For, although they all might agree without compromise of individual viewpoint that certain uses were more important than others, the question of the order in which, for example, reduction of federal deficits, of municipal deficits, and of state deficits, should be placed, would inevitably depend upon the individual point of view of the judge, and no agreement on that subject is possible except by compromise. In these circumstances the judges would be compelled to award the prizes not on the merits, but almost entirely upon chance, for, with no fixed standards except the individual point of view of the judge, a concurrence of view could only happen through a method of give and take; and so in the end the contest would depend upon the arbitrary action of the judges. Likewise it is unthinkable to us that the judges could point out the obvious error of any contestant or establish the superiority of the one contestant over the other, or announce or establish any satisfactory rule for determining such superiority. So that, after all, the awarding of the prize will depend upon the judges' selection of a list of uses in accordance with their arbitrary views and without definite and fixed rules of reason. Even conceding the integrity of the judges and the fixing by them of some common ground of primacy, it is nevertheless obvious that whatever ground of certainty is attained must be reached by an inescapable element of chance. Considered in that light, the conclusion is irresistible that the prize will go to him who is the most fortunate in guessing how the judges will finally compose their differences. And guessing contests have invariably been held to be within the ban of the statute. They have been said again and again to be entirely unlike a contest of essays decided

upon recognized standards of literary merit and reasonably well-settled ideas of sound argument.

In saying this we do not lose sight of the fact that a plausible argument may be made on the other side of the question, but the law commits the initial decision to the discretion of the Postmaster General, who is authorized to act "upon evidence satisfactory to him," and we are powerless unless his ruling is palpably wrong. If the case as presented to us manifestly did not involve a lottery, it would be our duty to afford the relief asked, but, for the reasons we have briefly shown, the contention that it is not a lottery cannot be said to be clearly right. The Postmaster General has said that the contest, and the manner of determining the winner, involve more chance than skill. That something may be said on the other side is not enough to enable us to overturn his decision. The Supreme Court has said the Postmaster General's action will not be reviewed in doubtful cases. While we feel no doubt of the conclusion we reach, it would help appellant none if we did, for unless we can say the Postmaster General was clearly wrong, we can say nothing.

Affirmed.