**FARLEY, Postmaster General v. HEININGER et al.**

No. 7240.

United States Court of Appeals for the District of Columbia.

Decided April 17, 1939.

Rehearing Denied May 18, 1939.

David A. Pine, U. S. Atty., H. L. Underwood, Asst. U. S. Atty., and George F. Breen, Asst. Atty., Office of the Solicitor, Post Office Department, all of Washington, D. C., for appellant.

John J. Sirica, of Washington, D. C., and Floyd Lanham, of Chicago, Ill., for appellee.

Before GRONER, Chief Justice, and MILLER and VINSON, Associate Justices.

**MILLER, Associate Justice.**

Appellee filed a bill in the lower court praying that a fraud order issued against him by the Postmaster General on February 19, 1938, pursuant to Sections 3929 and 4041, R.S.,[1] be declared null and void and its enforcement enjoined. The lower court found that "There was no substantial evidence that plaintiff herein [appellee] was engaged in a scheme or device to defraud, and therefore the decision of the Postmaster General was wrong and arbitrary." Accordingly it granted an injunction. This appeal is from that order.

Since 1926 appellee has been engaged in selling to the public, through the mails, artificial dentures, commonly known as false teeth. These dentures are manufactured at appellee's laboratory in Chicago, Illinois, from wax impressions made by his customers with material furnished by appellee and pursuant to instructions given by him. Since about 1932 appellee has advertised his product extensively in magazines and periodicals of general circulation throughout the United States, and has distributed circular matter by mail to persons who have inquired concerning artificial dentures. Included in this advertising literature were testimonials from customers and representations and statements such as the following:

"PEEK INTO MY MODERN SANITARY LABORATORY

"(Cut of Dr. Heininger inspecting plates.) It's the largest, Best Equipped Laboratory Making Dentures Exclusively In the Entire World! The pictures shown below give you just a 'peek' into my large, modern, sanitary laboratory, showing only a few scenes of my busy mammoth laboratory. My system of making plates in my up-to-date laboratory cuts the prices of false teeth right down to bed-rock prices. Here is your opportunity to get a high grade set of plates at prices that have been reduced to the lowest level. (Cut of Dr. Heininger examining letter from patron.)

"* * * No experience necessary to make your own impressions. It is so easy to do. Get your plates. See them with your own eyes, hold them in your own hands. Try them in your own mouth, chew with them—eat with them—see how they help to restore facial expression. * * *

* * * * * *

"* * * Smile with ease, talk with ease, laugh with ease! Get a set of my

---

[1] 39 U.S.C.A. § 259; 39 U.S.C.A. § 732.

guaranteed plates and you will be amazed at the improvement in your appearance.

\* \* \* \* \* \*

"\* \* \* In One Pennsylvania Town Alone, 131 people are wearing plates made by me. They are completely satisfied and have saved big money. They tested them, tried them, *proved them in every possible type of mouth, and under all possible, conceivable conditions.* \* \* \*

\* \* \* \* \* \*

"\* \* \* Just one example of what **is** possible in this age of progress, is that you can obtain a set of artificial dentures that will restore facial expression and give to the wearer *full power of mastication.* \* \* \*

\* \* \* \* \* \*

"After years of experience, the doctor is happy in the knowledge that he can furnish the highest type of plates, constructed only from the better materials, at prices so reasonable that many of his customers have saved from $10.00 to $60.00.

"\* \* \* Many claim they have attained better health since wearing plates made by Dr. Heininger. Others state that local dentists informed them that it was not possible to have well fitting teeth because of certain oral peculiarities, yet that when they received plates from Dr. Heininger, the plates were so well fitting that often they forgot the dentures are in their mouths. \* \* \*

\* \* \* \* \* \*

"DON'T BUY FALSE TEETH

"Until You Have Written to Dr. Heininger! If you are in need of False Teeth, here is good, surprising news for you. Dental plates can now be made by mail!

"Dr. S. B. Heininger, a registered, practising dentist, with many years of experience in fitting plates, makes your plates from your own impressions and you can try them 60 days on this startling trial offer! \* \* \*

\* \* \* \* \* \*

"Dr. Heininger, a specialist in Postal Prosthodontia, heads the world's largest, best equipped laboratory making dentures exclusively. His system of making plates in his modern, sanitary laboratory cuts the prices of false teeth right down to rock-bottom.

"\* \* \* At last you can have the opportunity to *enjoy mouth health, happiness and glorious comfort for life!"* [Italics supplied]

On September 22, 1937, appellee was cited to appear and show cause why the order complained of should not be issued against him. A hearing was held before an assistant solicitor of the Post Office Department, at which appellee appeared, was represented by counsel, and introduced evidence in his own behalf. From the evidence adduced at this hearing the solicitor found that representations made by appellee in his advertisements and circulars were false and fraudulent, in several particulars, *i. e.,* that no experience is necessary to make one's own impressions; that dentures made therefrom will fit the purchaser perfectly and give real, complete and perfect ease and comfort and satisfaction for life; that the dentures will restore full power of mastication and enable one to chew, eat, laugh and smile with perfect ease, that they are beautiful and natural looking, and will fit every possible type of mouth, including those having oral peculiarities; and that those purchasing such dentures will receive the same degree of utility, improvement of appearance, perfection of fit, life-long comfort and other advantages as were alleged to have been obtained by individuals whose purported testimonials appear in appellee's advertising matter. The solicitor, therefore, recommended that a fraud order be issued. The Acting Postmaster General determined from these findings that appellee was engaged in "conducting a scheme or device for obtaining money through the mails by means of false and fraudulent pretenses, representations, and promises," in violation of the pertinent statutes and, in accordance with the solicitor's recommendation, issued the fraud order.

▇▇ The sole question to be decided is whether there was substantial evidence warranting the issuance of a fraud order in the present case. The conclusion of the Postmaster General is presumptively correct[2] and "will not be reviewed by the courts where it is fairly arrived at and has substantial evidence to support it, so that it cannot justly be said to be palpably

2 Bates & Guild Co. v. Payne, 194 U. S. 106, 109, 24 S.Ct. 595, 48 L.Ed. 894. See United States v. Chemical Foundation, Inc., 272 U.S. 1, 14, 15, 47 S.Ct.

1, 71 L.Ed. 131; Proctor & Gamble Co. v. Coe, 68 App.D.C. 246, 249, 96 F.2d 518, 521, certiorari denied, 305 U.S. 604, 59 S.Ct. 65, 83 L.Ed. ——.

82

wrong and therefore arbitrary."[3] We cannot substitute our judgment for that of the Postmaster General.[4] It is of no importance that we might have reached a different result, or that the evidence is susceptible of different interpretations. The statute commits primarily to the Postmaster General the duty of determining whether, from all the evidence, the law has been violated. It is only in a case where there is no evidence reasonably to support the conclusion found that we may enjoin the enforcement of a fraud order. Farley v. Simmons, 69 App.D.C. 110, 99 F.2d 343, certiorari denied, 305 U.S. 651, 59 S.Ct. 244, 83 L.Ed. ——. Appellee does not challenge the correctness of this statement of the rule, but contends that there is no substantial evidence in the present case to support the order in question. With this we cannot agree.

■ It appears from the testimony of three dental experts that dentures made in accordance with appellee's representations cannot achieve the perfection of fit and utility claimed for them. The findings on this point, adopted by the Postmaster General in making his decision—and which find ample support in the record—read in part as follows:

"The testimony of all three of these experts shows conclusively that . . . [appellee's] 'system' omits a number of processes absolutely vital to the securing of properly fitting and functioning plates, that the Heininger method differs radically in many particulars from sound, recognized dental practice, and that the making of properly fitting dentures can be insured only by close adherence to an involved and highly technical procedure carried out with the greatest precision and care by skilled and competent operators with the patient constantly available in person for examination, preparation of the mouth and repeated trial fittings and adjustments."

He found, also from their testimony, that in order to insure well fitting plates it is essential to obtain an accurate impression of the mouth; that plates made from impressions taken in the manner prescribed by appellee may not only fit improperly but may cause injury to the tissues and muscles of the mouth and may obstruct circulation and produce excessive resorption of the alveolar ridges, "so that the patient will be ultimately precluded from wearing any dentures whatsoever."

Several sets of teeth were ordered from appellee by the post office inspector who investigated the case, for himself and others. At the hearing they were inserted in the mouths of the persons for whom they were ordered and were then examined by Dr. L. G. Jordan, a practitioner, who for three years prior to the hearing had been a professor of prosthetic dentistry. The following finding describes the result:

". . . From this demonstration, it was manifest, and the expert testimony so showed, that in no case did these dentures fit the mouth for which ordered and that indulgence of the wearers in such normal activities as eating, talking and laughing was utterly impracticable. In one case, a denture was furnished to fit over a fragment of root imbedded in the gum of the purchaser. In another an upper plate furnished would not remain in position at all unless retained there by the hand or by pressure of the lower teeth and it extended so far beyond the lowers as to leave an extensive and unsightly gap in the occlusal plane, thus preventing a satisfactory bite. In still other instances the dentures received were so large and the plate line so low as to greatly distort the facial expression of the wearers and create an effect which was both grotesque and ludicrous. Examination of the dentures purchased in this manner showed further that plates received at different times for the same individual varied in width and otherwise, and while an attempt was made by counsel for respondent [appellee] to attribute these variations to changes occurring in the mouth of the patient during the period between orders, the expert testimony shows that dentures made for this subject by his

---

[3] Leach v. Carlile, 258 U.S. 138, 140, 42 S.Ct. 227, 228, 66 L.Ed. 511; National Conference on Legalizing Lotteries, Inc. v. Farley, 68 App.D.C. 319, 96 F.2d 861, certiorari denied, 305 U.S. 624, 59 S.Ct. 85, 83 L.Ed. ——; Farley v. Simmons, 69 App.D.C. 110, 99 F.2d 343, certiorari denied, 305 U.S. 651, 59 S.Ct. 244, 83 L.Ed. ——.

[4] See Hand, J., in Putnam v. Morgan, C.C.S.D.N.Y., 172 F. 450, 451: "Personally, as I have said, I should not have held the complainant to so strict an interpretation of her advertisement. I think the razor fairly answers the description; but, if a writ is to go, I must go further, and hold that no one can reasonably conclude anything else, and I will not say that." See also, Enterprise Sav. Ass'n v. Zumstein, 6 Cir., 67 F. 1000, 1007.

own dentist several years prior to the first order being sent to Dr. Heininger still fitted his mouth perfectly and he was able to eat, laugh and talk therewith in a thoroughly satisfactory manner."

The record further shows that after advertising that his dentures would "give to the wearer full power of mastication", and obtaining orders based on that representation, it was appellee's practice thereupon to advise the customers so secured that he could not promise to restore the efficiency of the natural denture and that if the customer's condition was improved five per cent it would prove worth while.

 Appellee contends that the opinion testimony of the dental experts does not constitute substantial evidence because it is controverted by the physical facts as disclosed by the statements of persons actually wearing dentures made at appellee's laboratory. He contends further that since those who purchased his dentures were satisfied with them, there was no reason for holding that he was engaged in a scheme or enterprise to defraud. There are several answers to these contentions.

The physical facts—as disclosed even by letters from which appellee selected favorable excerpts for advertising purposes, and to the extent that such letters disclose the actual physical facts—support the testimony of the expert witnesses. Deleted portions of those letters contained such information as the following:

"1....They seem to be a little loose as I cannot keep them in my mouth without using the dental powder, and I don't want to have to keep on using the powder, tho I'm afraid if they are made smaller they will hurt my gums.

"The chewing surface is higher on the left side causing the lower plate to come up when I chew. I think probly its because the lower right side of my gum has perished away more owing to the teeth being taken out longer.

"I am returning the teeth with the pink wax so you can see and probly understand where the trouble is.

"2....But the lower plate dont fit I can't ware them at all the gums is to wide apart and the in Side of the gums is to long I am mailing them back to day hoping that you will under Stand it all and that I will get a Better fit next time hoping to hear from you Soon

"3....My upper plate fits fine. I am not having having having any trouble in wearing them, but the under works up if I talk, and jump out of place when I try to eat with them."

The following finding relates to the physical facts and is amply supported by the record:

"With a view to securing full and reliable data with respect to the character of dentures actually furnished by Dr. Heininger to writers of testimonials an extended tour was made in ten states by the post office inspector who investigated this case, Dr. Frederick W. Harper, the dental expert on the staff of the United States Public Health Service who later testified at the hearing and counsel for the respondents. During the course of this tour fifty persons who had previously written letters of endorsement with respect to their plates were called upon and although in every instance, at the request of counsel for Dr. Heininger, these persons signed an additional written statement expressing great satisfaction with their dentures, careful visual and digital examination thereof in their mouths by the dental expert representing the Government and whose testimony in connection therewith was adduced by the Government at the hearing showed that in not a single instance had properly fitting or functioning teeth been furnished. Included among numerous other conditions found by this expert in the mouths of these testimonial givers were the following: plate resting on diseased root; protuberance of bone preventing plate from fitting properly; complete lack of retention, teeth set off ridge; plate dislodged by facial movements; teeth striking in only one place; incisal plane incorrect; protrusion; no trimming of plate for accommodation to muscles; no provision for lateral movement of jaws (in every case); cross bite; marked irritation of tissues; occlusal plane lopsided; plate bearing area not properly covered; trauma; mold of teeth too large; mold of teeth too small; plate dropped when mouth was opened; lips forced apart by teeth; roughness in plate resulting from attempted· trimming by wearer; lowers would not stay in; insufficient space between arches; median lien in wrong place; plate would not go to place; teeth lower on one side than on other; ridges flabby and teeth retained by use of powder."

Dr. Harper testified further as to these fifty persons:

"I might state that in all these cases there has never been made any provision for any lateral movements whatever. I tried to have these patients with full dentures make lateral movements. None of them could do it, because there was no provision made for it. All they could do, if they could make any movement· at all, was just an up-and-down movement, because the teeth were locked in position when they closed."

To support his contention that the testimony of the dental experts should be disregarded, appellee relies upon such cases as American Car & Foundry Co. v. Kindermann, 8 Cir., 216 F. 499; United States v. Perry, 8 Cir., 55 F.2d 819; United States v. Donahue, 8 Cir., 66 F.2d 838; United States v. Perkins, 10 Cir., 64 F.2d 243; Grant v. United States, 5 Cir., 74 F.2d 302, certiorari denied, 295 U.S. 735, 55 S.Ct. 651, 79 L.Ed. 1683; Hamilton v. United States, 5 Cir., 73 F.2d 357. Those cases, however, are readily distinguishable. In each, the physical facts were contradictory of the expert, opinion testimony and were positive and actual. In the present case, on the other hand, the so-called physical facts relied on by appellee consist also of opinions. The fact that the opinion of an expert is in conflict with the opinions of others who are not experts does not deprive it of substance.

The case of American School of Magnetic Healing v. McAnnulty,[5] is also easily distinguishable from the present case. There the Postmaster General was enjoined because the representation complained of was a matter of scientific opinion not susceptible of proof. Scientific opinion on the subject, at the time the opinion was written, was unformed and divided. Consequently, there was no "exact standard of absolute truth by which to prove the assertion false and a fraud." Since the statutes in question do not assume to deal with mere "matters of opinion upon subjects which are not capable of proof as to their falsity" the action of the Postmaster General was held to have been arbitrary and unreasonable.[6] In the present case, however, we are dealing with a matter of established professional procedure, concerning which the representations made by appellee are easily susceptible of demonstration and of proof. Qualified members of appellee's profession testified that his representations could not be, and had not been, fulfilled.

That the artifice practiced upon the public may have gone undiscovered and may have even met with complete success is of no consequence. As was said in O'Hara v. United States, 6 Cir., 129 F. 551, 555: "Schemes to defraud depend for success not on what men can do, but upon what they may be made to believe, and the credulity of mankind remains yet unmeasured." This is particularly true in a case such as the present where one, holding himself out to be a member of a highly specialized profession, offers a service to the public, the members of which are not professionally trained and hence are dependent upon the integrity and judgment of those who are. See Seven Cases v. United States, 239 U.S. 510, 517, 518, 36 S.Ct. 190, 60 L.Ed. 411. When a business is "systematically and designedly conducted upon the plan of inducing its patrons, by means of false representations, to part with their money in the belief that they are purchasing something different from, superior to, and worth more than, what is actually being sold," it becomes objectionable under the statutes in question, even though, as in the present case, there is a promise to refund the purchase price should the article sold prove unsatisfactory. Harris v. Rosenberger, 8 Cir., 145 F. 449, 458, 13 L.R.A.,N.S., 762 certiorari denied, 203 U.S. 591, 27 S.Ct. 778, 51 L.Ed. 331. The purpose of Sections 3929 and 4041, R.S., is to prevent the use of the mails as a medium for disseminating printed matter which, on grounds of public policy, has been declared to be non-mailable. New v. Tribond Sales Corp., 57 App.D.C. 197, 19 F.2d 671; certiorari denied, 275· U.S. 550, 48 S.Ct. 114, 72 L.Ed. 420; Missouri Drug Co. v. Wyman, C.C.E.D.Mo., 129 F. 623, 625. The decisive factor, therefore, is not whether "any one complains of fraud, or was in fact defrauded", but whether the mails are being used to project a scheme which may result in obtaining money from members of the public by means of false and fraudulent statements.[7]

---

[5] 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90.

[6] 187 U.S. 94, 104, 23 S.Ct. 33, 47 L. Ed. 90.

[7] Fairfield Floral Co. v. Bradbury, C.C. D.Me., 89 F. 393, 396; Durland v. United States, 161 U.S. 306, 315, 16 S.Ct. 508, 40 L.Ed. 709. For similar cases arising under the mail fraud statutes, see: Schauble v. United States, 8 Cir., 40 F.2d 363, 367; Wilson v. United States, 2 Cir., 190 F. 427, 434; Busch v. United States, 8 Cir., 52 F.2d 79, 82; Hill v. United States, 5 Cir., 73 F.2d 223, 224.

Reversed and remanded with instructions to dissolve the injunction and to dismiss the bill.