REILLY, POSTMASTER, *v.* PINKUS, TRADING AS AMERICAN HEALTH AIDS CO., ALSO KNOWN AS ENERGY FOOD CENTER.

No. 31.   Argued October 13, 1949.—Decided November 14, 1949.

*Robert L. Stern* argued the cause for petitioner. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Morison, Paul A. Sweeney* and *Cecelia Goetz.*

*Bernard G. Segal* argued the cause for respondent. With him on the brief was *Irving R. Segal.*

MR. JUSTICE BLACK delivered the opinion of the Court.

Federal statutes have long authorized the Postmaster General to forbid delivery of mail and payment of money orders to "any person or company" found, "upon evidence satisfactory" to him, to be "conducting any . . . scheme or device for obtaining money . . . through the mails by means of false or fraudulent pretenses, representations, or promises . . . ."[1] Following a hearing the Postmaster

[1] R. S. 3929, as amended, 39 U. S. C. § 259; R. S. 4041, as amended, 39 U. S. C. § 732.

General issued such an order restricting respondent's use of the mails.[2]

The representations on which the order is based relate to respondent's anti-fat treatment, nationally advertised under the name of "Dr. Phillips' Kelp-I-Dine Reducing Plan." "Kelp-I-Dine" is a name used by respondent for granulated kelp, a natural seaweed product containing iodine. The Reducing Plan is twofold: It requires users to take one-half teaspoonful of "Kelp-I-Dine" per day, and suggests following a recommended daily diet which accompanies the vials of kelp.

Respondent's advertisements made expansive claims for its plan. They represented that persons suffering from obesity could "eat plenty" and yet reduce 3 to 5 pounds in a week surely and easily, without "tortuous diet" and without feeling hungry. Unhappy people eager to reduce but also eager to eat plenty were repeatedly reassured with alluring but subtly qualified representations such as these: "Remember with the Kelpidine Plan, you don't cut out ice cream, cake, candy, or any other things you like to eat. You just cut down on them." The alleged safety of the remedy and extraordinary efficacy of kelp were emphasized in advertisements stating that it "makes no difference if you are 16 or 60, or if you have diabetes, rheumatism or any other ailment. Kelpidine is always safe and doctors approve the Kelpidine plan. You simply take a half teaspoon of Kelpidine once each day and eat three regular sensible meals. Kelpidine decreases your appetite."

Two doctors with wide general knowledge in the field of dietetics and treatment for obesity were called by the Government in the fraud hearing. They testified

---

[2] The order did not forbid delivery of mail to respondent Pinkus individually. It did forbid delivery to trade names used by respondent Pinkus, "American Health Aids Company and Energy Food Center, and their officers and agents as such . . . ."

that iodine, to which respondent chiefly attributed the fat-reducing powers of kelp, is valueless as an anti-fat; that kelp would not reduce hunger; that the suggested diet was too drastic to be safe for use without medical supervision, particularly where users suffered from chronic diseases such as diabetes and heart trouble. The one physician called by respondent testified that iodine was used by physicians as a weight reducer, and expressed his judgment that it did have value for such use. Even he, however, conceded that the daily dosage of iodine to reduce weight would be fifty to sixty times more than the iodine in respondent's daily dosage of kelp. The respondent's witness also admitted that the recommended diet was "rigid," and might prove harmful to persons suffering from tuberculosis, anemia, or heart disease.

The findings of the Postmaster General were that kelp is valueless as a weight reducer and that whatever efficacy there was in the remedy lay in the diet recommendations. He also found that the diet was neither uniformly safe nor harmless and might be particularly dangerous for persons afflicted with heart and kidney troubles; that the diet could not, as represented, be pursued in ease and comfort, without hunger, while eating the things respondent had led people to believe they could. On these findings the fraud order was entered.

The District Court granted an injunction against enforcement of the fraud order on the ground that the order was unsupported by factual evidence.[3] Asserting that there was "no exact standard of absolute truth" against which respondent's advertisements could be measured, the court held that the testimony of the two doctors on which the Government's case rested was reduced by the conflicting testimony of respondent's witness to the status of mere opinion. As such, the evidence was held insufficient.

[3] 71 F. Supp. 993. See also 61 F. Supp. 610.

under the rule laid down by this Court in *American School of Healing* v. *McAnnulty,* 187 U. S. 94. The Court of Appeals affirmed on substantially the same ground.[4] Both courts distinguished *Leach* v. *Carlile,* 258 U. S. 138, where we held that a difference of opinion as to whether a product had any value at all did not bar a fraud order based on claims of far greater curative powers than the product could actually have. Important questions concerning the scope of the *McAnnulty* case and the sufficiency of evidence to support postoffice fraud orders prompted us to grant certiorari.

*First.* It is contended here, as both courts below held, that the findings of the Postmaster General must be set aside under the rule of the *McAnnulty* case. There the Postmaster General had forbidden use of the mails upon finding as a fact that petitioner was guilty of falsehood and fraud in obtaining money by representations based on claims that the "mind of the human race is largely responsible for its ills, . . . and that the human race does possess the innate power, through proper exercise of the faculty of the brain and mind, to largely control and remedy the ills that humanity is heir to . . . ." This Court set aside the fraud order, pointing out that there were two widely held schools of opinion as to whether the mind could affect bodily diseases, and that scientific knowledge had not advanced to the point where an actual intent to deceive could be attributed to one who asserted either opinion. Thus there was "no exact standard of absolute truth by which to prove the assertion false and a fraud." At best, testimony either way was held to be no more than "opinion" in a field where imperfect knowledge made proof "as of an ordinary fact" impossible.

Respondent appears to argue that the *McAnnulty* case bars a finding of fraud whenever there is the least conflict

---

[4] 170 F. 2d 786.

of opinion as to curative effects of a remedy. The contention seems to be that even the testimony of the most experienced medical experts can never rise above a mere "opinion" unless the expert has made actual tests of the drug to determine its effects in relation to the particular representations alleged to be false. The *McAnnulty* holding did not go so far. We do not understand or accept it as prescribing an inexorable rule that automatically bars reliance of the fact-finding tribunal upon informed medical judgment every time medical witnesses can be produced who blindly adhere to a curative technique thoroughly discredited by reliable scientific experiences. But we do accept the *McAnnulty* decision as a wholesome limitation upon findings of fraud under the mail statutes when the charges concern medical practices in fields where knowledge has not yet been crystallized in the crucible of experience. For in the science of medicine, as in other sciences, experimentation is the spur of progress. It would amount to condemnation of new ideas without a trial to give the Postmaster General power to condemn new ideas as fraudulent solely because some cling to traditional opinions with unquestioning tenacity.

In this case there is conflict, though slight, as to whether kelp or iodine is valueless as a weight reducer. But even if we assume that medical opinion is yet in a state of flux on this question, we think that there was sufficient evidence to support the findings that the efficacy of the "Reducing Plan" as a whole was misrepresented in respondent's advertising. And we think those misrepresentations went beyond permissible "puffing" of a seller's wares; they were material representations on which credulous persons, eager to reduce, were entitled to rely. Despite subtle qualifying phrases it is difficult to read these advertisements as a whole without receiving the impression that, contrary to facts justifiably found by the Postmaster General, kelp is a sure and drastic weight

reducer; that a user can reduce without uncomfortably restricting his usual ample diet of fattening foods; that the treatment is absolutely safe and harmless to people of all ages, to the ill and the well. See *Donaldson* v. *Read Magazine,* 333 U. S. 178, 188–189. These representations, if made with intent to deceive, fall squarely within the type which in *Leach* v. *Carlile,* 258 U. S. 138, were held to justify findings of fraud.

*Second.* Nevertheless we are constrained to hold that the present fraud order should not be enforced. It has been pointed out that the doctors' expert evidence rested on their general professional knowledge. To some extent this knowledge was acquired from medical text books and publications, on which these experts placed reliance. In cross-examination respondent sought to question these witnesses concerning statements in other medical books, some of which at least were shown to be respectable authorities. The questions were not permitted. We think this was an undue restriction on the right to cross-examine. It certainly is illogical, if not actually unfair, to permit witnesses to give expert opinions based on book knowledge, and then deprive the party challenging such evidence of all opportunity to interrogate them about divergent opinions expressed in other reputable books.

Petitioner seeks to justify exclusion of cross-examination based on some of these books by pointing out that they were merely medical dictionaries. Government experts testified they would not consult the dictionaries to ascertain the efficacy of a remedy, although they kept and used them for other purposes. But the books did assert the use of kelp as a fat reducer, and to some extent this tended to refute testimony by government experts that no reputable physicians would accept kelp or iodine as a weight reducer.

It is also contended that the error in restricting cross-examination was harmless here because the memorandum

of the fact-finding official indicated that he had read the excluded materials and would have made the same adverse findings had the materials been held admissible. But the object of using the books on cross-examination was to test the expert's testimony by having him refer to and comment upon their contents. Respondent was deprived of this opportunity. The error of this deprivation could not be cured by having the fact-finder subsequently examine the material.

Moreover, the issues in postoffice fraud cases make such cross-examination peculiarly appropriate. Proof of fraudulent purposes is essential—an "actual intent to deceive." See *Seven Cases* v. *United States*, 239 U. S. 510, 517. Consequently fraud under the mail statutes is not established merely by proving that an incorrect statement was made. An intent to deceive might be inferred from the universality of scientific belief that advertising representations are wholly unsupportable; conversely, the likelihood of such an inference might be lessened should cross-examination cause a witness to admit that the scientific belief was less universal than he had first testified.

The power to refuse enforcement of orders for error in regard to evidence should be sparingly exercised. A large amount of discretion in the conduct of a hearing is necessarily reposed in an administrative agency. And what we have said is not to be taken as removing this discretion or as a compulsory opening of the gates for floods of medical volumes, even where shown to be authoritative. But in this kind of case as in others, one against whom serious charges of fraud are made must be given a reasonable opportunity to cross-examine witnesses on the vital issue of his purpose to deceive. And in this case any holding of harmless error is precluded by the fact that the assistant solicitor presiding at the hearings adopted the prosecutor's view that respondent was to be barred from using the mails "regardless of the ques-

tion of good faith, even if the respondent believed in all of his representations . . . if they were false as a matter of fact."

It is not amiss to point out that the Federal Trade Commission does have authority to issue cease-and-desist orders in cases like this without findings of fraud. 15 U. S. C. § 45 (a), (b); *Federal Trade Comm'n* v. *Algoma Co.*, 291 U. S. 67, 81. But that remedy does not approach the severity of a mail fraud order. In *Federal Trade Comm'n* v. *Raladam Co.*, 316 U. S. 149, for instance, a business advertising its anti-fat product with extravagant statements similar in many respects to those of respondent here was ordered to cease and desist from making such statements. Except for this, the business was left free to sell its product as before. Unlike the Postmaster General, the Federal Trade Commission cannot bar an offender from using the mails, an order which could wholly destroy a business. See Brandeis, J., dissenting in *Milwaukee Pub. Co.* v. *Burleson,* 255 U. S. 407, 417 *et seq.* The strikingly different consequences of the orders issued by the two agencies on the basis of analogous misrepresentations emphasize the importance of limiting Postoffice Department orders to instances where actual fraud is clearly proved.

The judgment of the Court of Appeals is affirmed, without prejudice to a reopening of the proceedings against respondent to permit additional hearings should the Postmaster General choose to do so.

*It is so ordered.*

MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.