SHAW, Postmaster for Oklahoma City, Okl. v. DUNCAN et al.

No. 4371.

United States Court of Appeals, Tenth Circuit.

Feb. 23, 1952.

780

Hubert H. Margolies, Atty., Dept. of Justice, Washington, D. C. (Holmes Baldridge, Asst. Atty. Gen., Robert E. Shelton, U. S. Atty., Oklahoma City, Okl., and Edward H. Hickey, Attorney, Department of Justice, Washington, D. C., on the brief), for appellant.

Gus Rinehart, Oklahoma City, Okl., for appellee.

Before PHILLIPS, Chief Judge, and HUXMAN and PICKETT, Circuit Judges.

HUXMAN, Circuit Judge.

Appellee, E. C. Duncan, doing business as The Duncan Company, filed an application for a restraining order and for a permanent injunction against F. M. Shaw, Postmaster of Oklahoma City, Oklahoma, to restrain and enjoin him from enforcing a fraud order against him, issued by the Postmaster General of the United States.[1] The fraud order was in the usual form and instructed the Postmaster to return to the senders all letters and other mail arriving at the Oklahoma City Post Office, addressed to Duncan, and mark the returned mail "fraudulent." The trial court held that the fraud order was imprudently and arbitrarily issued and enjoined its enforcement.

1. These proceedings were instituted under 39 U.S.C.A. §§ 259 and 732.

The following is a summary of the evidence in the fraud order proceedings before the solicitor for the Postmaster General. Duncan advertised and sold through the mails a preparation called "Bloom Pills," as a cure for acne.[2] The pills contained calcium, sulphur and charcoal. One of the advertisements sent through the mail, upon which the charge of fraud was predicated, read as follows:

"O Joy! My Acne Is Gone.

Thousands have been made happy with Bloom Pills, a doctor's prescription. Most acne is caused from within and must be treated from within for any lasting relief. Full treatment guaranteed $4.00. Trial size $1.00. Money with order saves postage.

Duncan Company, Dept. M–1
2328 W. 21st St., Oklahoma City 7, Okl."

It was found that this in effect was a representation that relief would be lasting and that acne would go. The advertisement supports this finding. The Government offered the testimony of two physicians—Dr. Norris and Dr. McCaleb. Dr. Norris testified that in his practice he had treated people for acne; that he was familiar with the chemical analysis of these pills; that they contained calcium, sulphur and charcoal; that calcium was an old drug and that its limitations were well known; that it had been practically discarded for internal use and was used locally on the skin. He testified that calcium in deficiency diseases does not produce acne or pimples; that acne was not due to any lack of sulphur or calcium or any compounds thereof and that the treatment with such compounds was not an effective treatment or cure as a preventative for acne. He testified that Bloom Pills or any other sulphur dosage does not cure acne. On cross-examination, he testified that he believed he had seen a book called "Modern Dermatology and Syphilology" by Beckner and Overmyer; that while he thought he had looked into it on other subjects, he did not recall whether he looked to see what it said about acne. An objection was sustained to the question whether he did not

know that the doctors in their book recommended the use of sulphur in the treatment of acne on the ground that under the rules of practice of the department it was not allowed to read medical text books into the record. No exception was taken to the ruling and no further attempt was made to pursue this line of cross-examination.

Dr. McCaleb testified that calcium sulphide was an old drug; that its effects and limitations were well known; that acne was not due to the lack of calcium or sulphur or any compound thereof; that a treatment which contains calcium or sulphur taken internally will not cure acne; that it will have no effect on acne. On cross-examination, he testified that he had read the "Introduction to Dermatology" by Sutton and Sutton, fourth edition. An objection to the question whether it did not recommend the use of sulphur internally in the treatment of acne was likewise sustained.

Neither of these two Doctors had ever used or had any knowledge of the effect of the use of Bloom Pills. Dr. McCaleb testified that the factors he considered in reaching his conclusion that Bloom Pills had no curative value were based upon his own experience in the past in the use of calcium, together with modern trends, modern knowledge of today, and what had been and was being used as outlined in the journals and literature of today.

Appellee did not appear in person in the hearing before the examiner. His attorney offered his affidavit in evidence, in which he set out the beneficial results he had obtained from the use of Bloom Pills. An objection to its reception was sustained.

On the trial in the court below the proceedings before the trial examiner, upon which the Postmaster General's order was predicated, were introduced. In addition, there were introduced the judgment of dismissal in a previous criminal case upon a similar charge, as well as the affidavits of three doctors, stating that they had used calcium sulphide for the treatment

2. Acne is a disease of the skin most generally occurring in children at the time of puberty.

of acne with satisfactory results, and also Duncan's affidavit which had been rejected by the trial examiner. All of this additional evidence was improperly received. In reviewing a fraud order, such as this, the District Court does not sit de novo and try the case anew. Its jurisdiction is limited to a review of the proceedings before the Postmaster General to determine whether the evidence before him sustains his order. It may not on an independent investigation substitute its judgment for that of the Postmaster General.[3]

The trial court concluded that the evidence of the two Doctors constituted opinion evidence and that, therefore, there was no substantial evidence to sustain the fraud order. The facts in American School of Magnetic Healing v. McAnnulty, 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90, upon which the trial court primarily relied are materially different from the facts of this case. It is clear from the opinion and the construction placed upon the opinion by the Supreme Court in the late case of Reilly v. Pinkus, 338 U.S. 269, 70 S.Ct. 110, 94 L.Ed. 63, that the views of the medical profession had not crystallized as to the value of Magnetic Healing. There were two well defined opposing schools of thought. Under these facts, the Supreme Court held that the expression of opinion by the proponents of one school of thought would not be evidence. In Leach v. Carlile, 258 U.S. 138, 42 S.Ct. 227, 66 L.Ed. 511, the Supreme Court held that the views of the overwhelming majority of the profession constituted evidence and not merely the expression of an opinion, notwithstanding there was some contrarity of views. This view is also emphasized in Reilly v. Pinkus, supra, where the Supreme Court said: "The contention seems to be that even the testimony of the most experienced medical experts can never rise above a mere 'opinion' unless the expert has made actual tests of the drug to determine its effects in relation to the particular representations alleged to be false. The McAnnulty holding did not go so far. We do not understand or accept it as prescribing an inexorable rule that automatically bars reliance of the fact-finding tribunal upon informed medical judgment every time medical witnesses can be produced who blindly adhere to a curative technique thoroughly discredited by reliable scientific experiences." [338 U.S. 269, 70 S.Ct. 113.]

In this case there was no conflict in the evidence before the trial examiner. The evidence was positive that calcium sulphide has no curative value in the treatment of acne; that Bloom Pills have no curative value and that the internal use of calcium sulphide for such treatment has been discarded by the medical profession. If there is a substantial divergence in the views of the profession, it was the duty of the appellant to produce evidence showing the same before the examiner, but this he chose not to do. The undisputed evidence before the trial examiner supports the finding of fraud. Yet for the reasons hereinafter set out, we are constrained to affirm the judgment.

In Reilly v. Pinkus, supra, it is pointed out that the doctors' expert evidence rested upon general professional knowledge; that to some extent this knowledge was acquired from medical text books and publications, upon which the experts placed reliance; that in cross-examination respondents sought to question these witnesses concerning statements in other medical books, some of which at least were shown to be respectable authority, and that these questions were not permitted and that this constituted an undue restriction on the right of cross-examination. Because of this, the Supreme Court affirmed the judgment, enjoining the enforcement of the fraud order, but without prejudice to a reopening of the proceedings against respondent to permit additional hearings, should the Postmaster General choose to do so.

We do not think it was error to sustain the objection to the question propounded to Dr. Norris with respect to the teachings in "Modern Dermatology and Syphilology" as it treats of acne, because of his answer that he had never read the

3. Pinkus v. Reilly, D.C., 71 F.Supp. 993, and cases cited therein.

work. Dr. McCaleb, however, testified that he had read "Introduction to Dermatology" by Sutton and Sutton. He also testified that he believed he had read the article therein on the effect of giving calcium sulphide internally on acne quite a while ago when he was in school. We think the question propounded to him with respect thereto should have been answered.

 While the evidence was uncontradicted and was sufficient to sustain the fraud order, nonetheless because of the undue restriction with respect to the cross-examination of Dr. McCaleb, we think the judgment should be affirmed.

The judgment is, therefore, affirmed without prejudice, however, to a reopening of the proceedings against appellee to permit additional hearings should the Postmaster General choose to do so.