Joseph J. PINKUS, Trading as Spot Reducer Co., Spot Reducer Company, The "Spot Reducer," and Body Massager Co., Plaintiff,

v.

Louis A. REILLY, as Postmaster of the City of Newark, County of Essex, and State of New Jersey, Defendant.

Civ. A. No. 248–59.

United States District Court
D. New Jersey.

Nov. 16, 1959.

400

Fast & Fast, Newark, N. J., Schnader, Harrison, Segal & Lewis, by Edward W. Mullinix, Philadelphia, Pa. (Bernard G. Segal and Irving R. Segal, Philadelphia, Pa., of counsel), for plaintiff.

Chester A. Weidenburner, U. S. Atty., by Charles H. Hoens, Jr., Asst. U. S. Atty., Newark, N. J., for defendant.

HARTSHORNE, District Judge.

Plaintiff, Joseph J. Pinkus, trading as Spot Reducer Co., Spot Reducer Company, etc., here seeks to enjoin defendant, Louis A. Reilly, as Postmaster of the City of Newark, New Jersey, from enforcing a "fraud order" issued against the plaintiff by the Post Office Department, after a lengthy administrative hearing. Substantially this proceeding is for a judicial review of the administrative determination upon the basis of the lengthy certified record before the Post Office Department. The ultimate legal question before this Court is whether this record supports the administrative determination that a fraud order

should issue. Since this is a question of law dependent upon this written record, the parties have each filed motions for summary judgment, Boyd v. Folsom, D.C.W.D.Pa.1957, 149 F.Supp. 925. The administrative proceeding was that provided by the statute, 39 U.S.C.A. §§ 259, 732 [1] authorizing the Postmaster General to forbid the delivery of mail and the cashing of money orders directed to any person whom the Postmaster General finds to have been engaged in securing money through the mails by fraudulent representations. Our highest Court has held, in a case involving this same plaintiff, but another of his products for weight reduction, that such a fraud order lies only when there has been a showing of "an 'actual intent to deceive'." Reilly v. Pinkus, 1949, 338 U.S. 269, 276, 70 S.Ct. 110, 114, 94 L.Ed. 63. It is also the law that the reviewing court, in passing upon the validity of such an administrative proceeding, is "not to resolve contradictory inferences, but only to determine if there was evidence to support the Postmaster General's findings of fraud." Donaldson v. Read Magazine, 1948, 333 U.S. 178, 186,

68 S.Ct. 591, 596, 92 L.Ed. 628. The courts are not free to reverse such findings unless they are so palpably wrong as to amount to an abuse of discretion. Leach v. Carlile, 1922, 258 U.S. 138, 42 S.Ct. 227, 66 L.Ed. 511; New v. Tribond Sales Corp., 1927, 57 App.D.C. 197, 19 F.2d 671, certiorari denied, 1927, 275 U.S. 550, 48 S.Ct. 114, 72 L.Ed. 420; Borg-Johnson Electronics v. Christenberry, D.C.S.D.N.Y.1959, 169 F.Supp. 746.

In the light of these principles, we turn to the consideration of (1) what plaintiff Pinkus represented to the public in fact in the above regard, (2) whether these representations were true or false, and if false (3) whether Pinkus had an "actual intent to deceive."

1. *The representations of Pinkus to the public.*

These consist of the printed advertisements widely issued by Pinkus and the Spot Reducer Company. In the largest type, this advertisement reads, in part in black type on a white background, in part in white type on a black background,

---

[1] "§ 259. *Mail of persons conducting lotteries or fraudulent schemes returned; evidence of agency.* The Postmaster General may, upon evidence satisfactory to him that any person or company is engaged in conducting any lottery, gift enterprise, or scheme for the distribution of money, or of any real or personal property by lot, chance, or drawing of any kind, or that any person or company is conducting any other scheme or device for obtaining money or property of any kind through the mails by means of false or fraudulent pretenses, representations, or promises, instruct postmasters at any post office at which registered letters or any other letters or mail matter arrive directed to any such person or company, or to the agent or representative of any such person or company, whether such agent or representative is acting as an individual or as a firm, bank, corporation, or association of any kind, to return all such mail matter to the postmaster at the office at which it was originally mailed, with the word 'Fraudulent' plainly written or stamped upon the outside thereof; and all such mail matter so returned to such postmasters

shall be by them returned to the writers thereof, under such regulations as the Postmaster General may prescribe. * * *"

"§ 732. *Payment of orders issued in favor of lotteries.* The Postmaster General may, upon evidence satisfactory to him that any person or company is engaged in conducting any lottery, gift enterprise, or scheme for the distribution of money, or of any real or personal property by lot, chance, or drawing of any kind, or that any person or company is conducting any other scheme for obtaining money or property of any kind through the mails by means of false or fraudulent pretenses, representations, or promises, forbid the payment by any postmaster to said person or company of any postal money orders drawn to his or its order, or in his or its favor, or to the agent of any such person or company, whether such agent is acting as an individual or as a firm, bank, corporation, or association of any kind, and may provide by regulation for the return to the remitters of the sums named in such money orders. * * *"

"LOSE WEIGHT * * * REDUCE * * * SPOT REDUCER * * * TAKE OFF EXCESS WEIGHT * * * LOSE WEIGHT OR NO CHARGE." In smaller type the advertisement reads, "Results Quick, Sure and Harmless. No Exercises or Strict Diets. No Steam Baths, Drugs or Laxatives."

In addition, Pinkus advertised to lose weight "WHERE IT SHOWS MOST— REDUCE MOST ANY PART OF THE BODY—YOU CAN LOSE POUNDS AND INCHES SAFELY—MOST ANY PART OF YOUR BODY WHERE IT IS LOOSE AND FLABBY, WHEREVER YOU HAVE EXTRA WEIGHT AND INCHES, THE 'SPOT REDUCER' CAN AID YOU * * *"

Pinkus thus represented to the public that his spot reducer would not only reduce weight, this being its major headline, but reduce measurements of the body as well. The Government's charge regarding the reduction of measurements was abandoned, but the charge regarding the reduction of weight remains.

Pinkus contends that more readers of his advertisement would be interested in reducing their "measurements" than their actual "weight." But whether or not this is so, it is clear that his advertisement stressed mainly the reduction of weight. So, even if his representations as to the reduction in measurements were true, his advertising would be a misrepresentation, if his major representation as to the reduction in weight is untrue.

In the next place, the above advertisement shows that this spot reducer will give "sure" results, also that it will attain these results without the addition of exercises, diets, steam baths, drugs or laxatives, i. e., when the spot reducer alone is resorted to. Since it adds that the spot reducer will aid "most any part of your body where it is loose and flabby, wherever you have extra weight and inches", it is clearly intended that this spot reducer is to be used where this looseness and flabbiness exists, and where this extra weight and inches exist, i. e., the reducer is a "spot reducer", not a reducer for generalized massage, irrespective of this looseness, flabbiness or extra weight. Such are the representations made in fact by Pinkus to the public.

But the record further shows that at the same time that Pinkus was making these representations as to his spot reducer, he was also marketing another reducing product named Fucine. In fact, he had commenced to market Fucine before he started to market his spot reducer, and he had continued the above advertisements as to his spot reducer for some two or three years before he ended his Fucine representations in 1948. In his Fucine advertisements he admits he included a printed statement that vibrating devices were of no value for the reduction of weight. Plaintiff's only reply to this proof of clearly inconsistent representations to the public as to the effectiveness to reduce weight of a vibrating device such as his spot reducer, is that the Fucine statement was taken by one of his employees from another book. But he admits he was quite aware that that representation had been made to the public for some years over his name.

2. *Were plaintiff's representations to the public true or false?*

The substance of the plaintiff's representations, so far as pertinent here, are that the spot reducer will reduce weight, that it will do so alone without being combined with other aids, such as exercise, diets, drugs, laxatives, or steam baths, that the vibrator is for local, not generalized, massage, and that its results are "sure."

All the medical experts called by the Government deny the correctness of each of these representations, as do all the textbooks which they recognize as authorities. Further, only one of the four medical witnesses offered by Pinkus, Dr. Rubin, supports these representations to the public, while another of his experts, Dr. Gehl, not only differs with it, but says he told Pinkus of this when Pinkus talked to him—and this before marketing his spot reducer.

More specifically, not only is the testimony of the Government medical experts, Dr. Wise, Dr. Kalb, and Dr. Putnam, all to the above effect, but Dr. Kalb, a specialist in obesity, testifies, in detail, as to a lengthy test he conducted in that regard in 1943, under the supervision of a hospital staff, with some twenty patients. He further testified that not only had he written articles in that regard to that effect, but after reading all pertinent articles in the medical profession, such was the consensus of those experienced in that field. Turning to the plaintiff's medical experts, the first, Dr. Dick, while saying that massage may be helpful in the reduction of weight, admits that he has never used the spot reducer or any other massage agent alone to cause weight reduction. Thus he cannot support Pinkus' claim that the spot reducer alone will do so. Furthermore, he says that where "the massage is carried out over the body", i. e., not locally but generally, it "causes a reduction in weight." But Pinkus prescribes the spot reducer locally where particular flabbiness exists, not that it be used generally. Dr. Dick, therefore, does not support Pinkus on this second point. The next medical expert of plaintiff, Dr. Waltier, who frankly admits he is not "qualified as a physiotherapist", with obesity being but a small part of his private practice, testifies as to tests conducted by him, not as to loss of weight, but as to loss of inches—an issue now beside the point. Outside of Dr. Gehl, the only other expert produced by plaintiff Pinkus, Dr. Rubin, again testifies only from his "private practice," and not from any writings or tests. His practice was general, with obesity accounting for only about 10% of his work. His conclusion is that massage affects "local metabolism," contrary to his colleague Dr. Dick. Finally, plaintiff calls to the stand Dr. Gehl, a specialist, who had consulted with Pinkus before he started to market the spot reducer. True, Dr. Gehl is clear, on the point here undisputed, that the spot reducer may reduce measurements. But he is equally clear that it will not reduce weight, at least when used alone without dietary or other aid. Indeed, when Dr. Gehl is shown the Monnell article, appearing in "Principles and Practice of Physical Therapy," edited by Mock, Pemberton & Coulter, which is ambiguous as to whether massage will reduce weight or measurements, he says he can agree with that writer only if his ambiguous statement means the reduction of measurements, not that of weight.

The Monnell article is the only text on the subject which, even ambiguously, supports Pinkus' contention that local massage will reduce weight. The other textbooks, Erickson, Rosenthal, and Bierman and Licht, which the various witnesses rely on as authorities—and here both sides agree that it is the recognition of the witnesses which makes the book evidential, not the book itself—fail to support plaintiff's contention, and are quite the other way. See Erickson, chapter headed "Therapeutic Uses of Massage", which says: "Massage will not remove fat deposits even if vigorous heavy movements are used." With this Dr. Gehl agrees "absolutely", as also with Dr. Rosenthal's book. See also Bierman and Licht, "Physical Medicine and General Practice," 3rd ed. 299: "Contrary to popular belief, massage does not directly increase muscle power nor does it remove fat." Dr. Gehl, when faced with this, answers "Right." In fact, after having his attention called to the Monnell article in Mock, which might be ambiguously interpreted as saying that massage will reduce fat, Dr. Gehl not only says that massage will not reduce fat, but when asked if he knows of any authority that it will, says flatly "No. Massage will not reduce fat." When asked, "Is that the consensus of opinion?" he answered, "That is correct." Of course, with commendable accuracy Dr. Gehl indicates he is here speaking not of the reduction of fat in measurement, but in weight, and he is also careful to say that he agrees with Dr. Krusen's book on "Physical Medicine * * *" where, in chapter 4, on the "Therapeutic Uses of Massage", Dr. Erickson says: "In spite of the extensive use of massage in mod-

ern times, there is a paucity of accurate data concerning the effects in humans. Elkins has pointed out that massage is far from being an exact science." However, the exactness of the science, or lack of same, does not mean that a consensus of medical opinion cannot be found in regard to the effect of massage on weight reduction as opposed to other uses of massage, and, as to weight reduction, Dr. Gehl's testimony for Pinkus shows that such a consensus exists in fact.

This outstanding medical expert for plaintiff says it is "the consensus of opinion" that "massage will not reduce fat" so far as its weight is concerned. Of this Pinkus was advised before he commenced to advertise his spot reducer to the contrary. Thus, not only the medical experts, but the texts recognized by them as authoritative, would seem to clearly support the conclusion at the administrative hearing that the representations of Pinkus to the public that his spot reducer alone would surely reduce weight were incorrect.

Furthermore, this finding can be made, despite some medical views to the contrary. This was clearly set forth by the Supreme Court in *Reilly v. Pinkus,* supra, where the Court interprets and limits the scope of the decision in American School of Magnetic Healing v. McAnnulty, 187 U.S. 94, 23 S.Ct. 33, 47 L. Ed. 90, by stating, 338 U.S. at page 274, 70 S.Ct. at page 113:

> "We do not understand or accept it [the McAnnulty holding] as prescribing an inexorable rule that automatically bars reliance of the factfinding tribunal upon informed medical judgment every time medical witnesses can be produced who blindly adhere to a curative technique thoroughly discredited by reliable scientific experiences. But we do accept the McAnnulty decision as a wholesome limitation upon findings of fraud under the mail statutes when the charges concern medical practices in fields where knowledge has not yet been crystallized in the crucible of experience."

The mere fact that a solitary medical witness opined to the contrary of this medical "consensus" from his limited private practice would simply indicate that this practioner was one "who blindly adhere[d] to a curative technique thoroughly discredited by reliable scientific experiences." In other words, the Post Office Department could rely upon the consensus of informed medical judgment to the contrary to establish the falsity of the Pinkus representations.

To paraphrase *Reilly v. Pinkus,* supra, 338 U.S. at page 274, 70 S.Ct. at page 113, Pinkus' above "misrepresentations went beyond permissible 'puffing' of a seller's wares; they were material representations on which credulous persons, eager to reduce, were entitled to rely. Despite subtle qualified phrases, it is difficult to read these advertisements as a whole without receiving the impression that, contrary to facts justifiably found by the Postmaster General, kelp (the spot reducer) is a sure and drastic weight reducer; that a user can reduce without uncomfortably restricting his usual ample diet of fattening foods; that the treatment is absolutely safe and harmless to people of all ages, \* \* \*" [Parenthesis this court's].

Since plaintiff's product "was so far from being the panacea which he was advertising it through the mails to be, by so advertising it, he was perpetrating a fraud upon the public." *Leach v. Carlile,* supra. The evidence presented was clearly sufficient to show that the efficacy of the spot reducer as indicated in the advertisements was misrepresented in fact.

Nor can it be said that the adoption of this consensus of the authorities, both experts and texts, amounts to a condemnation of new ideas without a trial. Were massage a new and relatively untried art, that might well be the case. But massage has been well known and widely practiced for many years. The fact that the texts thereon may not be multitudinous cannot be said to be due to the fact that massage is a "new idea."

*Reilly v. Pinkus,* supra, 338 U.S. at page 274, 70 S.Ct. at page 113.

3. *Were the misrepresentations of Pinkus to the public intentionally false?*

Since a trial rarely eventuates where one has admitted an intentional material falsehood, in situations like the present the courts have been called upon to infer fraudulent intent from the surrounding circumstances. The Supreme Court has itself suggested in cases like the present one method of inferring the requisite intent, i. e., whether there is a "universality of scientific belief" that the representations involved were false, *Reilly v. Pinkus,* supra, 338 U.S. at page 276, 70 S.Ct. at page 114. In the present case it has been established by substantial evidence, both of experts and of texts accepted by these experts as authoritative, as indicated above, that medical science is not in accord with the representations made by Pinkus. Here again the mere fact that a small minority tenaciously cling to a contrary view would not prevent such a conclusion.

It should perhaps be noted that in *Reilly v. Pinkus,* supra, while the Supreme Court held that the Department had not permitted Pinkus to cross-examine, as it should have, the Court did conclude that Pinkus' then representations as to Kelp-i-dine were misrepresentations in fact, 338 U.S. at page 274, 70 S.Ct. at page 113. Further, that these misrepresentations might be intentional if contrary to "a universality of scientific belief", 338 U.S. at page 276, 70 S.Ct. at page 114. But the Court did not there determine whether Pinkus' false advertisements as to Kelp-i-dine were intentionally false, since it held the fraud order as to Kelp-i-dine invalid because of the improper restriction of cross-examination by Pinkus.

However, in this case this question must be decided and the record is replete with evidence in that regard, quite irrespective of the theory of the Supreme Court that the "universality of belief" might raise such an inference.

Thus, in his Fucine advertisement plaintiff represented to the public that a vibrating device would not reduce weight. Only a short while thereafter he then represented that his vibrating device, the "spot reducer", would reduce weight. Obviously, he knew one or the other of these representations was false. Nevertheless, for a year or more thereafter, plaintiff continued to advertise both these representations to the public. Clearly, these advertisements by him were intentional. Clearly, since they were contradictory, he knew he was then stating an intentional falsehood to the public.

Now plaintiff claims, of course, that it was his Fucine advertisement which was false. But it has been seen above that, both according to the consensus of the medical profession and according to the testimony of the medical experts before the Department, his spot reducer advertisement as to weight was untrue. Not only so, but in issuing this untrue advertisement Pinkus flew in the face of the contrary advices he had received, and before first marketing his spot reducer, from his own expert, Dr. Gehl, of outstanding experience in that particular field. Clearly, his publication of this representation, untrue in fact, despite this warning from his own expert, is consistent with his previous action in publishing the above inconsistent representations to the public as to Fucine and his spot reducer, one of which he knew must be untrue. His then action in issuing the spot reducer advertisement, to the contrary of these warning advices of Dr. Gehl, simply further confirms the inference that he knew the advertisements were untrue.

Furthermore, Pinkus' testimony is replete with lapses of memory as to whom he consulted and what he read on the subject of massage and weight reduction before marketing his product. Note his statement that he read Dr. Kalb's article but forgot all but one sentence. The main theme of the Kalb article dealt with the lack of value of massage as it applies to obesity. The only sentence Pinkus remembered did not involve this main theme. Again, while he claims to

have consulted twenty doctors before he advertised his spot reducer, he cannot remember one of their names, save that of Dr. Gehl. Again, while he claims also to have read certain textbooks, he cannot recall the name of a single one except that of Monnell. This text, it is recalled, was both guarded and ambiguous on the subject of weight reduction by massage, and Dr. Gehl says Monnell is wrong in this regard.

No lengthy discussion is required as to the money back guarantee in Pinkus' advertisements. While there are two lines of cases in that regard,[2] neither of them holds that such a guarantee of itself constitutes a defense to a charge of fraud in such proceedings as the present. The guarantee is simply an additional factor to be considered, a factor which here does not suffice to prevent the inference of actual fraud raised for the many reasons cited above.

■ Thus, in view of all the circumstances noted above, the Department's finding that plaintiff had the requisite intent is clearly supported by the evidence. Such being the case, this Court must affirm the findings on the merits at the departmental hearing.

Plaintiff Pinkus, in addition, raises certain procedural objections which he claims invalidate the action of the Post Office Department against him.

*The compromise question*

■ Plaintiff says the Department made no real effort to compromise the situation, as called for by the provisions of the Administrative Procedure Act, 5 U.S.C.A. § 1004(b):

"The agency shall afford all interested parties opportunity for (1) the submission and consideration of facts, argument, offers of settlement, or proposals of adjustment where time, the nature of the proceedings, and the public interest permit * * *"

Of course, barring circumstances which would make any consideration of compromise improper, as stated in the statute, the Department was under the duty to consider a reasonable compromise offer on the part of plaintiff. But the statute does not compel the Department to accept such an offer against its better judgment. That the Department did consider the suggestions of Pinkus in that regard is obvious in the record from the correspondence involving that point that ensued between the two parties, which ran on for over two months, from June 11 to August 24, 1953.

Nor was the Postmaster General adamant upon the issuance of a "fraud order", so harmful to the business of plaintiff in that it involved returning his mail, marked "fraudulent", to all who sent orders for the spot reducer. In fact, the Department suggested omitting any such action, and simply having Pinkus make an affidavit that he would go out of business with the spot reducer for its then purposes. This would have saved Pinkus from humiliation and damage to his reputation in the public's mind, which would be the result were a fraud order issued.

■ Not only, then, did the Department, by way of attempting to compromise, suggest an alternative proposal to Pinkus, more favorable to him than a fraud order, but it also considered Pinkus' counterproposal in that regard to the Department. Here Pinkus proposed that he go out of business, but that a substantial period be given him meanwhile, during which he should receive his mail. As noted above, the Department concurred with his proposal to go out of business, but the parties could not concur on the period during which Pinkus should continue to receive his mail. As a practical proposition, after Pinkus had himself

2. (1) Harris v. Rosenberger, 8 Cir., 1906, 145 F. 449, 13 L.R.A.,N.S., 762; Farley v. Heininger, 1938, 70 App.D.C. 200, 105 F.2d 79, certiorari denied 1939, 308 U.S. 587, 60 S.Ct. 110, 84 L.Ed. 491.

(2) Jarvis v. Shackelton Inhaler Co., 6 Cir., 1943, 136 F.2d 116, 117; Jeffries v. Olesen, D.C.S.D.Cal.1954, 121 F.Supp. 463.

suggested his going out of business, the Department could hardly be expected to concur in a proposal that Pinkus stay in business, whether this proposal came before, during, or after the administrative hearing. Its failure to do so thus does not evidence an adamant refusal to consider any compromise of the situation, particularly in the light of the other factors above enumerated. This objection of plaintiff is insubstantial.

*The renewed Department proceedings*

The history of this case is lengthy and complicated. The activities of Pinkus as to his fat reducing plan from a massage machine were first the subject of attack by the Postmaster General in 1946. This was after his advertisements to the public in Fucine, a different weight reduction device, that vibrating devices would not reduce weight. But plaintiff's spot reduction project preceded his similar litigation with the Department over Kelp-i-dine, Pinkus' third weight reducing project, the subject of the above decision of our highest court in *Reilly v. Pinkus*, supra. Since this first departmental hearing as to Pinkus' present product, the "spot reducer", preceded the new principle announced by the Supreme Court in *Reilly v. Pinkus*, supra, the Department in this prior hearing on his spot reducer had, unfortunately, restricted Pinkus' cross-examination in the very way *Reilly v. Pinkus*, supra, held the departmental hearing therein was rendered invalid. But before that decision was rendered as to Kelp-i-dine, Pinkus had commenced an action in this Court seeking to set aside the first departmental fraud order as to the spot reducer, and had obtained from this Court a temporary restraint forbidding its enforcement.

Thereafter, when the Department found, by virtue of the decision of our highest court in *Reilly v. Pinkus*, supra, that its then proceedings as to the spot reducer would doubtless be set aside as invalid, for the very cause found to invalidate its order involved in *Reilly v. Pinkus*, supra, the Department, in the light of its duty to protect the public, instituted a new proceeding of a similar nature against Pinkus, but based, not upon his advertisements in 1946 and theretofore, which were the basis of the first spot reducer proceedings against him, but upon his somewhat different advertisements in 1951—just before the institution of these second proceedings. Pinkus now claims these second proceedings are invalid for procedural reasons.

■■ However, plaintiff here overlooks several important facts. (1) As our highest court has said, in *Donaldson v. Read Magazine*, supra, 333 U.S. at page 184, 68 S.Ct. at page 595, where the Postmaster General modified a fraud order while the case was on appeal before the Supreme Court,

"We have no doubt as to the Postmaster General's authority to modify the fraud order. Having concluded that the original order was broader than necessary to reach the fraud proved, the Postmaster General not only possessed the power but he had the duty to reduce its scope to what was essential for that purpose * * * No persuasive reason has been suggested why the Postmaster General should be without power to modify an order of this kind."

Having the power to modify this order, having also the duty to protect the public, and learning of the defectiveness of his earlier proceedings from the recent decision of *Reilly v. Pinkus*, supra, it therefore lay within the discretion of the Postmaster General as to how to obtain, without unreasonable delay, the issuance of a fraud order which would be valid and would protect the public. To that end, the Postmaster General could have pursued alternative courses. He could have executed his admitted power by starting a new and valid proceeding— which he did. Or he could have fought Pinkus' attack on his first proceeding through the courts. This latter could only have cost both Pinkus and him additional time and expense, with the same result, i. e., a reopening of the proceedings against Pinkus to correct the defect

in the original proceeding by permitting additional hearings. His choice was thus both wise and fair, to Pinkus and to the public.

(2) Not only so, but the District Court stay simply prevented execution of the fraud order, which would have noticed all who ordered Pinkus' product that same was in fraud. It did not attempt to stay the Postmaster General, or even Reilly, the local Postmaster, from instituting new proceedings. There was no contempt of court involved. Indeed, this stay was itself dismissed by another branch of this Court after the starting of the new administrative proceedings here.

(3) Pinkus was not unduly harassed by these second proceedings. In fact, as seen above, they saved him the additional harassment of being required to take proceedings in the New Jersey District, and perhaps on appeal thereafter, to have such earlier proceedings invalidated, for the cause found to exist in *Reilly v. Pinkus*, supra. This cause plaintiff's counsel at the argument stated he was quite willing to assume existed in fact. Indeed, had Pinkus claimed he was being unduly harassed thereby, his appropriate remedy lay in a proceeding in the District Court for the District of Columbia against the Postmaster General himself, to see if he could prove such second proceeding to be undue harassment. But this Pinkus did not attempt.

(4) Nor do International Union of Mine, Mill and Smelter Workers etc., v. Eagle-Picher, etc., Co., 1944, 325 U.S. 335, 65 S.Ct. 1166, 89 L.Ed. 1649, and certain similar cases, aid plaintiff. They all go to the well known point that there should be a finality to litigation. Thus, since a final decree in these cases had been entered by the Court, and in fact in *Eagle-Picher* this decree had lain dormant for more than two years thereafter, our highest Court held that the N.L.R.B. did not have the right to reopen that case. On the contrary, here there had been no final decree by any court affirming the administrative determination. In addition, as seen above, the Post Office Department had the power and the duty to modify its action, in justice to all concerned, and this it did in a way which saved plaintiff Pinkus both time and money.

In short, this last procedural objection of plaintiff is without substance.

Since plaintiff's procedural objections lack substance, and on the merits, there is ample support in the record for the Department's finding that plaintiff had been conducting a "scheme for obtaining money or property of any kind through the mails by means of [intentionally] false or fraudulent * * * representations", defendant's motion for summary judgment will be granted, and an order may be entered accordingly, also vacating the preliminary injunction now in effect.