**F. H. HARRIES and Aileen Harries, his wife, Appellants,**

v.

**UNITED STATES of America, Appellee.**

**No. 19345.**

United States Court of Appeals Ninth Circuit.

Aug. 20, 1965.

Stephen S. Gorey, Herbert L. Ely, Gorey & Ely, Phoenix, Ariz., for appellants.

John W. Douglas, Asst. Atty. Gen., Alan S. Rosenthal, Robt. C. McDiarmid, Attys., Dept. of Justice, Washington, D. C., Jo Ann D. Diamos, Acting U. S. Atty., Tucson, Ariz., for appellee.

Before HAMLEY, HAMLIN and DUNIWAY, Circuit Judges.

HAMLEY, Circuit Judge:

In this action against the United States, F. H. Harries and his wife seek damages for loss sustained when Harries contracted encephalitis following a border smallpox vaccination administered by employees of the United States.[1] Plaintiffs predicated liability on the asserted failure of border officials to advise Harries that the vaccination might cause him to contract encephalitis and that, instead of submitting to vaccination, he could have insisted upon the alternatives of isolation or surveillance.[2] Plaintiffs also alleged in their complaint that the United States breached an implied warranty that the vaccination would not cause Harries to contract encephalitis.[3]

District court jurisdiction was asserted under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680 (1964). The Government denied essential allegations of the complaint and advanced several affirmative defenses. The case was tried to the court without a jury. Judgment was entered for the United States and plaintiffs appeal.

The judgment for defendant was based on several grounds, the critical one being that plaintiffs had failed to sustain their burden of proving that the border vaccination was the proximate cause of the encephalitis suffered by Harries. This conclusion of law by the trial court was based upon a finding of fact that it is as probable that Harries' encephalitis was caused by mumps as by smallpox vaccination. On appeal plaintiffs challenge this conclusion of law and finding of fact.

The conclusion of law is correct if the finding of fact is not clearly erroneous within the meaning of Rule 52(a), Federal Rules of Civil Procedure.

It is undisputed that Harries contracted encephalitis within two weeks after the border vaccination at Nogales, Arizona on April 7, 1961. The factual evidence pertinent to a determination of whether the encephalitis was caused by the vaccination or by mumps, is also undisputed.

This evidence shows that Harries, who was fifty-seven years old in April, 1961, had had mumps on both sides at the age of fourteen. He is an entomologist and was in charge of a substation of the United States Department of Agriculture at Wenatchee, Washington. He and his wife entered Mexico on April 4, 1961,

---

1. Encephalitis is a clinical term descriptive of an inflammation of the brain.

2. The pertinent regulations relating to smallpox vaccination of persons arriving in this country, and the alternatives of isolation or surveillance, are set forth in 42 C.F.R. § 71.86(1960).

3. Plaintiffs did not allege that the vaccine was impure.

and returned on April 7, at which time the vaccination was administered. On April 12 or 13, while the Harries were visiting their son-in-law and daughter, Dr. and Mrs. J. Ballard Washburn, at Page, Arizona, Harries' left arm, which was the arm vaccinated, began to turn red and swell.

Harries commenced to feel ill about this time and stayed in Page one extra day because of this illness. After leaving Page on April 15, Harries' arm continued to swell and redden. During their automobile drive home, and in the vicinity of Walla Walla, Washington, Harries became confused and Mrs. Harries took over the driving. Harries returned to work on April 18, but on the morning of April 20, 1961, became quite ill and went home.

He remained home the rest of that day and, on the next morning, April 21, was rude to one of his assistants who came to visit him. Later that morning Mrs. Harries asked Dr. Roy B. Kerkow, a partially retired doctor who lived next door, to look at her husband. Dr. Kerkow did so and found Harries in bed, very fearful and non-communicative. After a ten-minute examination, Dr. Kerkow declined to take the case. Instead, he called in Dr. Lecil C. Miller as attending physician and Dr. Harry David Hunter as consultant.

On the next day, April 22, Harries was admitted as a patient to Deaconess Hospital, Wenatchee. At that time he was comatose, with a fever of 106°. After a fairly extensive illness, Harries was discharged from the hospital on May 31, 1961. He then returned to his work. Blood samples taken on May 9, May 15 and June 19, 1961 were subjected to mumps titer tests conducted by the Washington State Public Health Laboratory.[4] The mumps titer test of the May 9 blood sample was negative. The test based on the May 15 sample was positive on mumps titer, showing a ratio of 1:16. The June 19, 1961 sample was also positive on mumps titer, showing a ratio greater than 1:64.

These facts pertaining to Harries' illness are uncontradicted. Plaintiffs contend that the encephalitis was caused by the smallpox vaccination; defendant, however, asserts that Harries suffered mumps encephalitis. In support of their respective positions, plaintiffs and defendant produced medical opinion testimony.

For plaintiffs, the initial examining physician, Dr. Kerkow, testified briefly by deposition. Based upon his brief examination of Harries, which was his only contact with the case, he concluded that Harries had an acute psychosis, etiology unknown.

Dr. Hunter, also testifying for plaintiffs by deposition, is a specialist in psychiatry, but with a very limited experience with encephalitis.[5] He first saw Harries in the early evening of April 21, 1961, finding the patient completely disoriented. His initial diagnosis was that Harries was psychotic, either functionally or organically. Dr. Hunter testified that since Harries' arm was at that time still red and indurated, he felt that the most likely cause would be encephalitis secondary to the vaccination, but with brain tumor as another possible cause of illness. This diagnosis was made before Harries' blood samples had been tested for mumps titer. But, in his deposition, Dr. Hunter stated that his diagnosis would not be changed by the results of those tests because he did not regard such tests as sufficiently specific.

Plaintiffs also produced the testimony, by deposition, of Dr. Robert J. Hoxsey, an internist who had been called in by

---

4. Mumps titers are counteracting antibodies which develop in the blood of a person afflicted with mumps.

5. In discounting the mumps titers tests, Dr. Hunter said: "But, let's face it, I'm no expert in the field of encephalitis or of the titers; but I do know there is a controversy about how specific this [mumps titer test] is."

Dr. Miller to consult on the treatment of Harries. Dr. Hoxsey stated that he first visited the patient on April 22, 1961. His final diagnosis was "encephalitis, post-infectious vaccinia." He expressed the opinion that the first two mumps titer tests were insignificant in themselves and that, in any event, he disregarded them since they were contrary to the clinical findings.

Dr. Hoxsey also expressed doubt as to whether a mumps titer test is specific enough to warrant a diagnosis of mumps encephalitis. He nevertheless conceded that the encephalitis suffered by Harries could have been caused by mumps. Dr. Hoxsey did not recall ever seeing a case of post-vaccinal encephalitis, nor had he ever made any study of encephalitis other than in medical school and in his residency.

In addition to the depositions of Drs. Kerkow, Hunter and Hoxsey, plaintiffs produced the oral testimony of their son-in-law, Dr. Washburn. Dr. Washburn had seen Harries at Page, Arizona both before and after the Mexican trip, and also saw him in the Wenatchee hospital on April 27, 1961, and on later dates. Dr. Washburn testified that, in his opinion, Harries had suffered from post-vaccinal encephalitis. He conceded, however, that he was not an expert on that type of encephalitis and had, in fact, never handled a case of either post-vaccinal or mumps encephalitis.[6]

The United States introduced the oral testimony of Drs. Griffith Ernest Quinby and Edwin Herman Lennette. Dr. Quinby is a specialist in preventive medicine and communicable diseases. In his career with the United States Public Health Service he had served as the officer in charge of the encephalitis research field study of that organization. Dr. Quinby had seen over a thousand cases of encephalitis and had been called into the Harries case by Dr. Miller, as a consultant in communicable diseases. At the time of the trial Dr. Quinby had retired from regular government employment and was in private practice, but was about to be appointed as consultant to the Public Health Service.

He testified that, to a reasonable medical certainty, Harries had suffered from mumps-encephalitis, or encephalitis caused by mumps. Dr. Quinby based his diagnosis on the increase in the mumps titer which, he believed, showed a recent infection with mumps. He stated that the mumps titer test was one of the most specific and reliable tests that could be done in the field of encephalitis diagnosis.

Dr. Lennette, who was the second doctor called by the Government, is Director of the Viral and Rickettsial Disease Laboratory for the California State Health Department. This laboratory frequently receives federal grants. Harries' counsel referred to Dr. Lennette as " * * * an eminent virologist, eminent," and as " * * * one of the most leading [sic] authorities on the subject in this country."

Dr. Lennette, answering a hypothetical question, expressed the opinion that to a reasonable medical certainty, a patient having a medical history, symptoms and test results similar to those of Harries,

---

6. Plaintiffs did not call the attending physician, Dr. Miller, nor would they permit the Government to take his deposition, asserting the physician-patient privilege. While the Government did not raise the point and it is therefore not to be considered on this appeal, it is appropriate to note that there is authority for the proposition that a litigant may not obtain affirmative relief in a civil action while withholding, on a claim of privilege, evidence relevant to the claim. See Levine v. Bornstein, 7 A.D.2d 995, 183 N.Y.S.2d 868, aff'd 6 N.Y.2d 892, 190 N.Y.S.2d 702, 160 N.E.2d 921. Instead of denying affirmative relief where an evidentiary privilege is claimed, some courts have held the privilege waived. See the cases cited in 28 Fordham Law Review 537-40 (1959). This court so held in a recent habeas corpus proceeding where the applicant sought to invoke the attorney-client privilege to suppress the facts surrounding his failure to raise the question of alleged illegal search and seizure at his criminal trial. See Henderson v. Heinze, 9 Cir., 349 F.2d 67.

had suffered from mumps encephalitis. He stated that the term post-vaccinal encephalitis had been for years applied merely on an empirical and observational basis, with no explanation known as to the causation. Now, however, Dr. Lennette testified, tests are available to separate some of the various types of encephalitis. He stated that the serological tests used to identify the mumps virus were considered to be highly accurate and quite adequate.

Dr. Lennette further stated that the probability of post-vaccinal encephalitis occurring was from one in 100,000 to one in 175,000 or 200,000 vaccinations. Encephalitis associated with mumps, on the other hand, occurs in almost two per cent of the clinical cases of mumps. Dr. Lennette added that infection with mumps virus is not necessarily expressed by glandular involvement, since the virus can go directly to the brain or spinal cord, in which case it can be revealed only by the serological tests.

While we believe this constitutes a fair résumé of the medical testimony, it is not intended to reflect every explanation, qualification, or shade and nuance of the respective medical opinions. Likewise, we have not thought it practicable, within the reasonable limits of an appellate opinion, to set forth and discuss each point of attack against the testimony of Drs. Quinby and Lennette, advanced in plaintiffs' opening brief and countered in the answering brief. We have, however, considered all such thrusts and parries. On balance, we feel that the trial court was not obliged, for any reason advanced by plaintiffs, to discredit defendant's expert testimony.

▆ A finding of fact is "clearly erroneous" when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed. United States v. United States Gypsum

Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746. The United States, as the prevailing party in the trial court, is entitled on this appeal to all favorable inferences which may reasonably be drawn from the evidence. Wineberg v. Park, 9 Cir., 321 F.2d 214, 218. Moreover, the weight of the medical testimony was for the trial court to determine. See Tuck v. United States, 9 Cir., 282 F.2d 405, 410, dealing with expert testimony in the field of security apraisal.

Viewing the summarized evidence in the light of these principles, we conclude that the finding of fact of the trial court that it is as probable that Harries' encephalitis was caused by mumps as by the smallpox vaccination, is not clearly erroneous. Indeed, we would have found it necessary to sustain the trial court if it had affirmatively found that the encephalitis was caused by mumps and not by the vaccination. The district court therefore did not err in concluding that plaintiffs failed to sustain their burden of proof on the issue of causation.

▆ Plaintiffs contend that the trial court abused its discretion in limiting their cross examination of Dr. Lennette. Following the direct examination of Dr. Lennette, which occupies about eleven pages of the reporter's transcript, he was cross examined by plaintiffs on the basis of his own experience, his own writings, and the writings of others in the field of serology.

Plaintiffs first point to an observation made by the trial court when declaring a short recess after the cross examination of Dr. Lennette had extended through seventeen pages of the transcript. The court then stated that the case would be finished that day even if a night session would be required. After cross examination of Dr. Lennette, extending through eleven additional pages of transcript, the colloquy quoted in the margin, to which plaintiffs call attention, occurred.[7] Five

---

7. "THE COURT: Choose from that book the material which you wish more than any other to bring to the attention of the witness and let that be the last book

referred to. I think we have indulged a great deal of liberality with books.

"MR. ELY: Your Honor, I have other publications by Dr. Lennette which con-

more transcript pages of cross examination were taken when the trial court stated: "You may have ten more minutes to complete cross examination of this witness." Counsel for appellants immediately voiced an objection to this limitation, but it was overruled.

The trial court held plaintiffs to this ten-minute limitation, reminding them of it when about five minutes had expired, and again when two minutes remained. Shortly thereafter, the trial court stated that only one more question of Dr. Lennette would be allowed, and when it had been asked and answered, the court terminated the cross examination. No objection other than that noted above was made by counsel for appellants. No offer of proof as to additional facts or opinions expected to be elicited from Dr. Lennette was tendered. By that time the cross examination of this witness had extended through thirty-nine pages of the court reporter's transcript.

The right to cross examine a witness is fundamental in our judicial system. Iva Ikuko Toguri D'Aquino v. United States, 9 Cir., 192 F.2d 338, 369. But unless a restriction of cross examination is so severe as to constitute a denial of that right, the extent to which cross examination shall be allowed rests within the sound discretion of the trial court. See Glasser v. United States, 315 U.S. 60, 83, 62 S.Ct. 457, 86 L.Ed. 680; Beck v. United States, 9 Cir., 298 F.2d 622, 629. Even where it cannot be said that cross examination was actually denied, the circumstances may be such as to indicate that the particular restriction in question constituted an abuse of discretion. See Reilly v. Pinkus, 338 U.S. 269, 275, 70 S.Ct. 110, 94 L.Ed. 63.

With these considerations in mind we have reviewed the cross examination of Dr. Lennette, and the limitation thereon placed by the trial court. Having in view the nature of the examination in chief, and the length, direction and effectiveness of the cross examination which was permitted, we think the trial court did not abuse its discretion in calling a halt on the basis of the indicated time limitation.[8] Had counsel for plaintiffs presented the court with an offer of proof indicating that crucial new areas needed to be explored, further latitude in the cross examination of Dr. Lennette might have been indicated and doubtless would have been permitted.

We therefore conclude that the right to cross examine Dr. Lennette was not erroneously abridged.

Affirmed.

---

tradict his testimony and would like the Court's permission—

"THE COURT: Will you read no language other than contradictory language then. Make it as brief as possible. We have to save time. We are going to finish this trial today, gentlemen. Proceed."

8. Some of the questions on cross examination intended to elicit Dr. Lennette's opinion of the writings of others which Dr. Lennette had not conceded were authoritative may have been improper. See the leading case of Ross v. Foss, 77 S.D. 358, 92 N.W.2d 147; also see, generally, 82 A.L.R. 440 (1933); 60 A.L.R.2d 77 (1958); Curran Law and Medicine (1960) page 445. However, all objections on this ground were overruled.